470 A.2d 56

**COMMONWEALTH of Pennsylvania, Appellant,**

v.

**John J. ZIEGLER, Appellee.**

Supreme Court of Pennsylvania.

Argued Oct. 21, 1983.

Decided Dec. 30, 1983.

---

Eric B. Henson, Deputy Dist. Atty., Mark Gurevitz, Asst. Dist. Atty., for appellant.

Burton Rose, Philadelphia, for appellee.

Before ROBERTS, C.J., and NIX, LARSEN, FLAHER-TY, McDERMOTT, HUTCHINSON and ZAPPALA, JJ.

## OPINION

McDERMOTT, Justice.

This is a discretionary appeal from the order of the Superior Court, 304 Pa.Super. 623, 450 A.2d 1055, affirming the order of the Court of Common Pleas of Philadelphia County, suppressing on *Miranda*[1] grounds statements given by appellee. We reverse.

Appellee, a Philadelphia Police Officer, became the subject of a homicide charge in a sequence of events arising out of the pursuit and apprehension of the driver of a vehicle. At approximately 4:30 p.m. on the afternoon of August 24, 1980, appellee, while on-duty and in uniform, observed what he suspected to be a stolen vehicle travelling at high rate of speed in a populous area, and attempted to stop the vehicle. The driver ignored these efforts and appellee gave chase. When the vehicle subsequently was stopped, at least one passenger fled while the driver remained behind the wheel. Appellee approached the vehicle with gun drawn. As he reached the door of the vehicle, appellee was knocked to the ground as the driver again put the vehicle in gear and drove a short distance before crashing. Appellee again approached the vehicle, an altercation with the driver ensued, and the driver suffered wounds, including a gunshot wound from appellee's gun. Approximately one hour later, at Temple Hospital, the driver was pronounced dead.

Radio messages between appellee and other police personnel concerning the sequence of events were monitored and recorded on the police communication network. Appellee's superior, a Lieutenant Puchalski, inquired over police radio as to how the driver had been shot, and appellee responded:

I hit him on the head, that's all.

[1] *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Upon arriving at the hospital, appellee was confronted by his superior, who stated:

> Well, the male's shot. Can you tell me how the male got shot?

Appellee responded:

> I didn't shoot anybody. I hit him with my gun. He tried to get away from me. He tried to run me over and we were struggling and I hit him.

The superior then asked for the gun, examined it to determine if it had been fired, and said to appellee:

> You have a spent shell, five live rounds. We have a male shot. Your gun went off, apparently. The male's shot and you shot him.

Appellee replied:

> I hit him. If my gun went off, you know, I didn't—it was an accident.

At that point, pursuant to departmental regulations, the supervisor directed appellee to report to Police Department Staff Inspector Headquarters, accompanied by another officer.[2]

---

**2.** Police Department Directive 10 provides for the following procedures in cases of discharge of a firearm by police personnel resulting in injury or death:

*    *    *    *    *    *

Cases resulting in injury or death.

a. Police Radio will be notified immediately from the scene. The Commanding Officer of Police Radio will immediately notify:

    (1) Duty Commander, Detective Bureau
    (2) Internal Affairs Bureau
    (3) Homicide Unit (only when a death occurs or is likely to occur)
    (4) Detective Division of Occurrence
    (5) District of Occurrence
    (6) District or Unit to which officer is assigned.

b. The officer who fired the weapon will not make any statements, except to personnel of the Internal Affairs Bureau.

c. The first supervisor at the scene will be responsible for the following:

    (1) The involved officer, if not incapacitated, is to be taken directly to the Internal Affairs Bureau.
    (2) Ensure that the provisions of Directive # 2 "Responsibilities at the Crime Scene" are carried out.

Appellee was joined at Staff Inspector Headquarters by his superior Lieutenant Puchalski. The superior offered to telephone appellee's family since, under departmental regulations, he was not himself permitted to make any calls. Also, pursuant to regulations, appellee's revolver was taken for ballistics tests. At approximately 6:40 p.m., the staff inspector, one Officer Taylor, arrived and commenced questioning of appellee. Between that time and midnight, appellee gave both oral and written statements to the staff inspector, and also drew a sketch illustrating where the events occurred leading up to the altercation. At no time were *Miranda* warnings given to appellee.

Five days later, on August 29, 1980, a complaint was issued for appellee's arrest on charges of murder and involuntary manslaughter. The post-mortem examination indicated that, while the immediate cause of death was the gunshot wound, blows to the decedent's head had caused two skull fractures which eventually could have caused death. On August 30, 1980, appellee voluntarily surrendered.

Appellee's motions to suppress evidence were considered by the Honorable George J. Ivins, of the Court of Common Pleas of Philadelphia County. Judge Ivins granted appellee's motions to suppress on *Miranda* grounds the second oral statement given to Lieutenant Puchalski at the hospital, as well as the oral and written statements and the sketch given to Inspector Taylor at Staff Inspector's Headquarters. The Commonwealth sought and was granted pre-trial appeal to the Superior Court. The Superior Court accepted jurisdiction and affirmed, *per curiam,* the suppression order, concluding that the statements given by appellee were the product of custodial interrogation. It is this decision which we now review.

Before addressing the merits, we note that appellee contends that the Commonwealth's pre-trial appeal should have been quashed as interlocutory. This argument must be rejected. Since the appellant has certified that suppression of appellee's statements would substantially handicap

the prosecution, appellee's contention must fail. *Commonwealth v. Bosurgi*, 411 Pa. 56, 190 A.2d 304 (1963), *cert. denied*, 375 U.S. 910, 84 S.Ct. 204, 11 L.Ed.2d 149 (1963).

■ The Commonwealth challenges the suppression of appellee's statements, contending that the questioning of appellee in this case occurred as part of a non-custodial, non-criminal, administrative investigation for which *Miranda* warnings are not required. We agree.

In *Commonwealth v. McLaughlin*, 475 Pa. 97, 379 A.2d 1056 (1977), this Court held that *Miranda* warnings were not required where a suspect appeared in response to a subpoena from the office of city comptroller concerning allegedly false expense vouchers. The *McLaughlin* Court held that that suspect was not in "custody" for *Miranda* purposes, although there was a sanction for failure to appear (non-payment of the questioned expenses). Moreover, the Court found that even though information obtained through the administrative investigation ultimately resulted in criminal prosecution, *Miranda* warnings were not required in investigations which were non-criminal in nature.

In the instant case the questioning of appellee was mandated by departmental regulation, and represented standard procedure operative whenever a policeman discharges a firearm resulting in injury or death.[3] The shooting occurred while appellee was engaged in the performance of his duty, pursuing a suspected felon who offered resistance, and there was nothing in the information then available to suggest that appellee's conduct was unlawful. It was not until five days later, after the post-mortem examination indicated that blows to the decedent's head may themselves have been a sufficient cause of death, that a complaint was issued for appellee's arrest. Thus, the post-shooting debriefing and questioning of appellee were conducted pursuant to routine administrative procedure, and appellee was

3. The relevant portion of Police Department Directive 10 is set out in n. 2, *supra.*

neither being held as a criminal suspect, nor had he reason to believe that such was the case.

It is argued by appellee that certain of the circumstances present constituted sufficient restriction upon his freedom of action as to comprise "custody" for *Miranda* purposes. Thus, appellee argues that the fact that his attendance before his superior was required, albeit under administrative regulation, or the fact that he was escorted by another officer are sufficient to make out a showing of custody. Such arguments must be rejected.

The protection of *Miranda* was designed to shield an accused from the coercive aspects of "custodial interrogations" where the accused might reasonably believe that he would be held incommunicado and not be released before confessing to a crime. *Miranda*, 384 U.S., 436, 446, 86 S.Ct. 1602, 1613, 16 L.Ed.2d 694 (1966). No such custody or restriction is made out by the facts of this case. While appellee was required to be present for questioning by his superiors in order to comply with police administrative regulations, this restriction on his freedom of action was in no sense "custody" for *Miranda* purposes. Although accompanied by another officer, appellee drove himself to police headquarters. Although appellee's gun was taken from him for ballistics testing, he was issued a replacement revolver. Furthermore, Inspector Taylor testified that he would not have restrained appellee had he attempted to depart.

Nor may it be argued that warnings were required simply because the questioning was conducted by the police. The relevant criterion is still the presence or absence of custodial interrogation. While a policeman is certainly entitled to no less a panoply of constitutional rights than is any other citizen, *Garrity v. State of New Jersey*, 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967), neither may it be contended that he deserves the greater degree of protection that would be afforded by extending *Miranda* to routine administrative investigations in employer-employee relationships such as the instant.

The gravamen of *Miranda,* its progeny,. and the entire field of law dealing with the Fifth and Sixth Amendments, is that the accused must not be *compelled* to incriminate himself. The warnings were instituted to protect an accused from giving statements as a result of having his will overborne by coercive police tactics:

> An individual swept from familiar surroundings into police custody, surrounded by antagonistic forces, and subjected to the techniques of persuasion described above cannot be otherwise than under compulsion to speak. As a practical matter, the compulsion to speak in the isolated setting of the police station may well be greater than in courts or other official investigations, where there are often impartial observers to guard against intimidation or trickery. (footnote omitted.)

384 U.S. at 461, 86 S.Ct. at 1621. These elements were clearly not present here.

The considerations underlying our decision in *McLaughlin* are thus dispositive of this case. We hold that the lower courts erred in suppressing appellee's statements on *Miranda* grounds where, as here, appellee's questioning occurred pursuant to non-criminal, administrative channels, and where appellee was not subjected to custody.

Accordingly, we vacate the order of the suppression court and remand this case to the Court of Common Pleas of Philadelphia for proceedings consistent with this decision.

LARSEN, J., files a concurring opinion in which HUTCHINSON, J., joins.

ZAPPALA, J., files a dissenting opinion.

LARSEN, Justice, concurring.

I agree with the majority that *Miranda* does not require the suppression of appellee's statements. In matters concerning the Fifth Amendment privilege against self-incrimination, this Court is of course bound by the pronouncements of the United States Supreme Court. *Malloy v. Hogan,* 378 U.S. 1, 10–11, 84 S.Ct. 1489, 1494–1495, 12

L.Ed.2d 653 (1964). *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) mandates that the prosecution may not use statements stemming from "custodial interrogation" of the defendant unless it demonstrates the use of procedural safeguards (i.e., the *Miranda* warnings) effective to secure the privilege against self-incrimination. The United States Supreme Court defined "custodial interrogation", and in so doing delineated the scope of *Miranda,* in stating:

> By custodial interrogation we mean questioning initiated by law enforcement officers *after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.*

*Miranda v. Arizona,* 384 U.S. at 444, 86 S.Ct. at 1612 (emphasis added).

This test for "custodial interrogation" has been consistently applied in this Commonwealth, with a nuance added by subsequent developments.

> [T]his jurisdiction's test of 'custodial interrogation' examines more than actual deprivation of freedom. Pennsylvania's test for custodial interrogation is
>
>> whether the suspect is physically deprived of his freedom in any significant way or is placed in a situation in which he reasonably believes that his freedom of action or movement is restricted by such interrogation....

*Commonwealth v. Meyer,* 488 Pa. 297, 306, 412 A.2d 517, 521 (1980) (numerous citations omitted); *Commonwealth v. Chacko,* 500 Pa. 571, 577, 459 A.2d 311, 314 (1983).

Viewing the totality of the circumstances [1] in this light, it is apparent that appellee was neither physically deprived, nor could he have harbored a reasonable belief that he had

1. While a particular factor may capture most of a court's attention in any given case, it is clear that, in determining whether a "custodial interrogation" has taken place, the court must look to the *totality* of the circumstances to determine whether the defendant was actually in custody or reasonably believed that his freedom of action had been significantly restricted. *See generally* Annot., 31 A.L.R.3d 565, *What Constitutes 'Custodial Interrogation' within Rule of Miranda v. Arizona Requiring that Suspect be Informed of his Federal Constitutional Rights Before Custodial Interrogation.*

been deprived, of his freedom of action in any significant way. Accordingly, I agree with the majority that *Miranda* warnings were not required and that the lower courts erred in suppressing appellee's statements.

HUTCHINSON, J., joins in this concurring opinion.

ZAPPALA, Justice, dissenting.

I dissent from the majority's holding today that the Appellee's inculpatory statements were not properly suppressed at trial. The salient holding of *Miranda* states:

> The prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. *By custodial interrogation we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.*

*Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966) (Emphasis added).

In *Commonwealth v. Chacko,* 500 Pa. 571, 459 A.2d 311 (1983), we held that the issue of custody for *Miranda* purposes is a subjective determination of whether a suspect reasonably believes that he is obligated to acquiesce to the inquiry. Furthermore, in *Rhode Island v. Innis,* 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980) the United States Supreme Court elaborated upon the type of interrogation which requires that *Miranda* warnings be given:

> [T]he term interrogation under Miranda refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus

reflects the fact that the Miranda safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. *A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation.* But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, *the definition of interrogation can extend only to words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response.*

446 U.S. at 301–302, 100 S.Ct. at 1689–1690 (Emphasis added).

It is undisputed that the Appellee's superior, Lieutenant Puchalski, confronted the Appellee at the hospital, having been properly advised[1] that an injury had occurred in the line of duty. Thus, according to department regulations, the questioning of the Appellee was mandated as standard procedure whenever a policeman discharges his firearm, resulting in injury or death (p. 58).

At the time that Lieutenant Puchalski appeared at the hospital, he inquired of the Appellee the circumstances surrounding the shooting of the deceased, knowing full well that an altercation had occurred between the Appellee and the victim. It is a reasonable assumption that the Appellee was expected to respond to any such inquiries, as he ultimately did. At the hospital and subsequently at staff

---

1. Under police regulations, any time an injury or death occurs from the discharge of a policeman's firearm, that officer shall immediately notify the police radio, who in turn shall notify the duty commander at the detective bureau, internal affairs bureau, homicide unit (if a death is involved), detective division of the occurrence, the district of the occurrence and the district or unit to which the officer is assigned. The regulation further states that the officer who fired the weapon will not make any statements except to personnel of the internal affairs bureau. Finally, it is the duty of the first supervisor at the scene to take the police officer involved directly to the internal affairs bureau.

headquarters, *it was clear that the Appellee was the focal point of the investigation and was required under the departmental regulations to cooperate and assist with the departmental investigation.* Therefore, given the coercive nature of the inquiry, the Appellee did not have the freedom of being non-responsive. [*See Commonwealth v. McGrath,* 504 Pa. ——, 470 A.2d 487 (1983), in which we held that a military investigation presented such a coercive atmosphere that *Miranda* warnings were required.] Since the Appellee was in custody for *Miranda* purposes, it was incumbent upon the Appellee's supervisor to give the required warnings prior to questioning the Appellee both at the hospital and subsequently at the staff inspector's headquarters. Because the Appellee was not given the *Miranda* warnings, the statements were properly suppressed.

Accordingly, I dissent from the majority opinion of this date and would affirm the actions of the suppression court.