855 A.2d 783

**COMMONWEALTH of Pennsylvania, Appellee**

v.

**Manuel SEPULVEDA, Appellant.**

Supreme Court of Pennsylvania.

Argued Dec. 4, 2003.

Decided Aug. 19, 2004.

220

Ellen C. Schurdak, Marshall E. Anders, Stroudsburg, for Manuel Marcus Sepulveda.

Donald M. Leeth, Amy Zapp, Harrisburg, Elmer D. Christine, Jr., Stroudsburg, for Com.

Before CAPPY, C.J., CASTILLE, NIGRO, NEWMAN, SAYLOR, EAKIN, LAMB, JJ.

## OPINION ANNOUNCING THE JUDGMENT OF THE COURT

Justice NIGRO.

In this capital case, Appellant Manuel Sepulveda appeals from the sentences of death imposed by the Court of Common Pleas of Monroe County. A jury found Appellant guilty of two counts of murder in the first degree, two counts of aggravated assault, criminal conspiracy, unlawful restraint, and tampering with or fabricating evidence. Following a penalty hearing, the jury determined that the one aggravating

circumstance it found with respect to each murder[1] outweighed the two mitigating circumstances it also found with respect to each murder.[2] Accordingly, the jury returned a sentence of death for each of the murder convictions,[3] and on January 27, 2003, the trial court formally imposed two death sentences against Appellant. After the trial court denied Appellant's post-sentence motion, Appellant filed this direct appeal.[4] For the reasons that follow, we affirm the judgments of sentence.

Appellant first contends that the jury's verdict convicting him of two counts of murder in the first degree was not supported by the evidence. As in all cases in which the death penalty has been imposed, this Court is required to determine whether the evidence is sufficient to sustain the verdict for first-degree murder. *See Commonwealth v. Spotz,* 552 Pa. 499, 716 A.2d 580, 583 (1998); *Commonwealth v. Zettlemoyer,* 500 Pa. 16, 454 A.2d 937, 942 n. 3 (1982), *cert. denied,* 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983). In conducting such a review, we must view the evidence admitted at trial, and all reasonable inferences drawn therefrom, in the light most favorable to the Commonwealth as verdict winner, and determine whether the jury could find every element of the crime beyond a reasonable doubt. *See Spotz,* 716 A.2d at 583; *Commonwealth v. Keaton,* 556 Pa. 442, 729 A.2d 529, 536 (1999). Circumstantial evidence alone is sufficient to convict a defendant of a crime. *See Commonwealth v. Rios,* 546 Pa. 271, 684 A.2d 1025, 1028 (1996), *cert. denied,* 520 U.S. 1231, 117 S.Ct. 1825, 137 L.Ed.2d 1032 (1997).

1. Specifically, the aggravating circumstance found by the jury was that Appellant had been convicted of another murder committed either before or at the time of the offense at issue, 42 Pa.C.S. § 9711(d)(11).

2. The two mitigating circumstances found by the jury were that Appellant had no significant history of prior criminal convictions, 42 Pa.C.S. § 9711(e)(1), and that he was only twenty-two years-old when he committed the murders, 42 Pa.C.S. § 9711(e)(4).

3. 42 Pa.C.S. § 9711(c)(4).

4. Pursuant to 42 Pa.C.S. § 9711(h), this Court has automatic jurisdiction to review the trial court's judgment of a sentence of death.

■■■ Evidence is sufficient to sustain a conviction for first-degree murder where the Commonwealth establishes that the defendant unlawfully killed another human being with the specific intent to do so.[5] *See* 18 Pa.C.S. § 2502(d); *Rios,* 684 A.2d at 1030. The use of a deadly weapon on a vital part of the body is sufficient to establish the specific intent to kill. *See Commonwealth v. Rivera,* 565 Pa. 289, 773 A.2d 131, 135 (2001); *Commonwealth v. Jones,* 542 Pa. 464, 668 A.2d 491, 500 (1995).

Here, the evidence adduced at trial establishes that on November 26, 2001, Appellant was at the home of Daniel Heleva and Robyn Otto in Polk Township, Monroe County, where he resided with the couple and their two children. At approximately 6:30 p.m., John Mendez and Ricardo Lopez arrived at the house to recover two guns that Mendez claimed belonged to him. Appellant retrieved the guns from an upstairs bedroom and gave them to Mendez. Mendez and Lopez then left.

Later that night, Heleva returned to the house with Richard Boyko and discovered that the guns were missing. After Appellant explained to Heleva that Mendez had taken the guns, Heleva instructed Boyko to call Mendez and have him come back to the house. At this time, another man, Jimmy Frey, was in the living room watching television.

Mendez and Lopez returned to the house, but Heleva did not permit Lopez to enter. Mendez, however, came inside, where Heleva immediately accused him of stealing his guns and the two men began fighting in the kitchen. When this fight was resolved, Appellant and Lopez joined Heleva and Mendez in the kitchen, where the four men then sat around the table talking. Boyko left the house. While the men were in the kitchen, another argument erupted. This time, Appellant grabbed a .12 gauge shotgun and shot Mendez in the stomach. He then turned the gun towards Lopez and shot him in the side. After Lopez collapsed on the floor, Appellant placed the barrel of the shotgun on Lopez's back and again

---

5. A defendant intentionally kills another human being if the killing was willful, deliberate, and premeditated. *See* 18 Pa.C.S. § 2502(d).

fired the weapon, killing him. Appellant then chased Mendez up the stairs to the second floor of the house, where he shot Mendez a second time. Although wounded, Mendez escaped from Appellant and Heleva and fled to a neighbor's house with Appellant and Heleva in pursuit. Mendez knocked on the neighbor's front door, but before anyone answered, Appellant and Heleva grabbed Mendez and dragged him across the lawn back to their house. Frey, who had been watching the incident, retrieved the shotgun that Appellant had dropped on the lawn, and hid it inside a sofa in the house. Once the men had dragged Mendez back inside, Appellant inflicted several blows with a hatchet type of weapon, killing him.

Meanwhile, police received a 911 call from Heleva's neighbor reporting a domestic violence dispute at Heleva's home. In response, Pennsylvania State Troopers Matthew Tretter and Joel Rutter arrived at the scene and spoke to the neighbor, who told them that she had heard a loud noise and a high-pitched voice screaming "help me" outside of her door and that when she looked outside, she had seen someone being dragged across her front lawn into Heleva's residence. The troopers noticed that there was a smear of blood on the neighbor's front door and that a wooden porch railing had been broken. The troopers then proceeded to Heleva's residence. Along the way, the troopers noticed a bloody jacket on the neighbor's lawn, and they observed blood on Heleva's door when they arrived. When the troopers knocked on the door and announced their presence, Appellant opened the door and initially denied knowledge of any incident, but then stated that he had been assaulted by two men.

At this time, Trooper Tretter placed Appellant in the back of the patrol car, handcuffed him, and, still believing that this was a domestic violence incident, asked Appellant where the woman was. Appellant responded: "There is no 'she.' They are in the basement. I shot them." *See* N.T., 11/15/2002, at 80. Trooper Tretter then called for backup. After additional state troopers arrived on the scene, they entered the residence, set up a perimeter and initiated a crime scene log. The

police found the bodies of Lopez and Mendez in the basement of the residence.[6]

The troopers transported Appellant, along with Heleva, Robyn Otto, and their children, to the Lehighton Barracks. Boyko and Frey were also rounded up and brought to the station. Once at the station, Trooper Joseph Sommers and Corporal Thomas McAndrew read Appellant *Miranda* warnings at approximately 3:45 a.m. Appellant signed a rights waiver form, and the troopers began to interview him. After about one hour, at approximately 5:04 a.m., Appellant began to make a tape-recorded statement. In this statement, Appellant admitted that he shot both Mendez and Lopez twice, but claimed that he only started shooting after he believed Lopez was about to go out to his car to retrieve a gun. *See* N.T., 11/18/2002, at 270–71. Appellant also admitted that after Mendez ran outside following the shooting, he and Heleva dragged Mendez back inside, at which time Appellant grabbed the hatchet type weapon and struck Mendez in the head. *See id.* at 272–73.

After Appellant made this statement, at approximately 6:00 a.m., the officers took a break from this questioning. Trooper Sommers and Corporal McAndrew conferred with the other investigators involved in the case and returned to Appellant for further questioning. At approximately 7:10 a.m., Appellant indicated that he wished to speak to Corporal McAndrew alone and proceeded to tell the corporal that he had lied in his original statement. Appellant then gave a statement which again implicated himself in the murders, but in this statement, Appellant claimed that he had actually only shot Lopez once, in the kitchen. *See* N.T., 11/19/2002, at 290. Appellant stated that he did not shoot Lopez the second time. *see id.* at 291.[7]

---

6. Lopez was found beneath slabs of insulation and dry wall material, with his pants pulled to his ankles, and Mendez was found beneath a pile of laundry, stripped naked with his thumb in his mouth and with a rubber bungee cord wrapped tightly around his neck.

7. Instead, Appellant indicated that Heleva shot Lopez the second time. According to Appellant's statement to Corporal McAndrew, after he shot Lopez and Mendez in the kitchen, he chased Mendez up the stairs, where the two engaged in a struggle. During that struggle, Appellant

Although Appellant also admitted that he shot Mendez a second time, Appellant claimed that it was Heleva who eventually struck Mendez in the head with the hatchet type weapon, killing him. *See id.* at 292–93.

Appellant also testified at his trial, where he again admitted to shooting both Lopez and Mendez. Appellant told the jury, however, that he had not intended to kill either Lopez or Mendez. *See* N.T., 11/21/2002, at 635–38. In general, Appellant's testimony described the events as he had recounted them in his second statement to Corporal McAndrew.[8] *See id.*

Dr. Samuel Land, who performed the autopsies on Mendez and Lopez, also took the stand at Appellant's trial. Dr. Land testified that, to a reasonable degree of medical certainty, the cause of Lopez's death was shotgun wounds to the chest and abdomen, and that each wound was to a vital part of the body and independently fatal. *See* N.T., 11/19/2002, at 343, 348–49. Dr. Land further testified that, to a reasonable degree of medical certainty, the cause of Mendez's death was gunshot wounds to the abdomen [9] and sharp force wounds to the head.

claimed that he heard shots fired from the kitchen where he had left Heleva with the gun. *See* N.T., 11/19/2002, at 291.

8. Although there were a few inconsistencies between Appellant's trial testimony and his statement to Corporal McAndrew at the police station, only two of the inconsistencies are worth noting. In his statement to Corporal McAndrew, as noted above, Appellant indicated that he had only heard Heleva shoot Lopez the second time. *See infra,* note 7. However, at trial, Appellant told the jury that after he shot Lopez and Mendez in the kitchen, he actually saw Heleva grab the gun and fire a second shot into Lopez's back. N.T., 11/21/2002, at 636. Second, although Appellant admitted to shooting Mendez a second time in both his statement to Corporal McAndrew and at trial, stating both times that the shooting occurred amidst a struggle between Heleva and Mendez, he described the circumstances of this particular shooting differently at trial than in his statement to Corporal McAndrew. *See* N.T., 11/19/2002, at 292;1/21/2002, at 637. In his statement to Corporal McAndrew, Appellant merely stated that he grabbed the gun away from Heleva and Mendez as they struggled, turned the gun toward Mendez, and shot him in the arm. *See* N.T., 11/19/2002, at 292. Meanwhile, at trial, Appellant testified that when he shot Mendez in the arm, he did so accidentally in an attempt to wrestle the gun away from Mendez and Heleva. *See* N.T., 11/21/2002, at 637.

9. Dr. Land explained that there were two shots fired at Mendez: one shot that penetrated Mendez's lower right abdomen, and one shot that

*Id.* at 358–61. Dr. Land stated that each of the gunshot wounds to Mendez's abdomen was to a vital part of his body. *Id.*

Based on this evidence, we agree with the trial court that there was clearly sufficient evidence to convict Appellant of the murders of Lopez and Mendez. Although Appellant now argues, without much elaboration, that there was not sufficient evidence to convict him because the Commonwealth failed to establish that he had the specific intent to kill anyone, the evidence shows just the opposite. As detailed above, Appellant shot both Mendez and Lopez in vital parts of the body, which alone is sufficient to establish Appellant's specific intent to kill. *See Rivera,* 773 A.2d at 135.[10]

In his next claim, Appellant argues that the trial court erred in denying the motion to suppress that he filed prior to his trial. Specifically, Appellant argues that the trial court should have suppressed: (1) his statement to Trooper Tretter in the patrol car, because he made it during the course of a custodial interrogation but before he was given *Miranda* warnings; and (2) the statement he made to Corporal McAndrew after he asked to speak with the corporal alone, as that statement was elicited after he had been in custody for over six hours, in violation of *Commonwealth v. Davenport,* 471 Pa. 278, 370 A.2d 301 (1977). For the reasons set forth below, we find that the trial court did not err in refusing to suppress these statements.

In evaluating the denial of a suppression motion, our initial task is to determine whether the trial court's factual findings are supported by the record. *See Commonwealth v.*

passed through Mendez's left forearm before striking his upper abdomen. *See* N.T., 11/19/2002, at 353–54.

**10.** Even assuming *arguendo* that Appellant only shot Lopez once and shot Mendez a second time only accidentally, as he claimed at trial, Dr. Land testified, as noted above, that both of the gunshot wounds suffered by Lopez were to vital parts of his body and that the first shot to Mendez's abdomen, which Appellant concedes he fired, was to a vital part of the body. Thus, even under Appellant's own version of the events at trial, the jury was entitled to infer that Appellant had the specific intent to kill both Mendez and Lopez.

*Bridges*, 563 Pa. 1, 757 A.2d 859, 868 (2000). In making this determination, we must "consider only the evidence of the prosecution's witnesses, and so much evidence of the defense that remains uncontradicted when fairly read in the context of the record as a whole." *Id.* When the evidence supports the factual findings, we are bound by such findings and may only reverse the suppression court if the legal conclusions drawn therefrom are erroneous. *Id.*

In the first instance, Appellant completely fails to explain how he was unduly prejudiced by the admission of either of the statements he now argues the trial court should have suppressed. Appellant took the stand at his trial and admitted that he did indeed shoot Lopez and Mendez, and this testimony was, in all material respects, similar to the second statement he gave to Corporal McAndrew at the police station. Likewise, Appellant's admission to Trooper Tretter in the patrol car that he had shot people is in no way inconsistent with his testimony at trial that he had shot Mendez and Lopez. Thus, we fail to see, and Appellant fails to demonstrate, how he was prejudiced by the admission of the two statements he now says the trial court improperly refused to suppress.[11] In any event, as discussed below, we agree with the trial court that each of the statements Appellant now complains of was properly admitted at trial.

Appellant first argues that the trial court erred in refusing to suppress his statement to Trooper Tretter in the patrol car because it was obtained while he was in police custody but before he was read his *Miranda* rights. We disagree.

Whether a person is in custody for *Miranda* purposes depends on whether the person is physically deprived of his freedom of action in any significant way or is placed in a situation in which he reasonably believes that his freedom of action or movement is restricted. *See Commonwealth v. Williams*, 539 Pa. 61, 650 A.2d 420, 427 (1994). The test for

---

11. Appellant makes no argument, for example, that his trial testimony was not substantially cumulative of the allegedly improperly admitted statements or that he only took the stand in an attempt to explain the two inculpatory statements that the trial court refused to suppress.

custodial interrogation does not depend upon the subjective intent of the law enforcement officer, but rather, focuses on whether the individual being interrogated reasonably believes his freedom of action is being restricted. *See id.; Commonwealth v. Brown*, 473 Pa. 562, 375 A.2d 1260 (1977). Once in custody, and prior to interrogation, a person must be provided with *Miranda* warnings before any statement he makes will be deemed admissible. *See id. Miranda* warnings, however, are not required in certain situations where the police ask questions to ensure public safety and not to elicit incriminating responses. *New York v. Quarles*, 467 U.S. 649, 655–57, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984); *Commonwealth v. Stewart*, 740 A.2d 712, 719–20 (Pa.Super.1999), *aff'd on other grounds sub nom. Commonwealth v. Perry*, 568 Pa. 499, 798 A.2d 697 (2002) (plurality).

Here, Appellant was clearly deprived of his freedom of action when Trooper Tretter handcuffed him, placed him in the back of the patrol car, and locked the door. *See Williams*, 650 A.2d at 427. Therefore, we agree with Appellant that he was indeed in custody for *Miranda* purposes at that time.[12] However, we also agree with the trial court that

12. In *Commonwealth v. Gwynn*, 555 Pa. 86, 723 A.2d 143, 149 (1999), a plurality of this Court, in an Opinion Announcing the Judgment of the Court ("OAJC"), concluded that the police officer's placement of the defendant in a patrol car, and subsequent handcuffing of the defendant, did not rise to the level of an arrest under the circumstances presented in that case. There, an officer stopped the defendant after the defendant repeatedly walked away from the officer in an area where a burglary had been reported. The officer asked the defendant for identification, but because the officer feared the defendant might flee after he kept moving his head, the officer placed the defendant in his patrol car. After a backup officer arrived, the officers thought they saw the defendant trying to escape, and as a result, they placed him in handcuffs. On appeal, the OAJC rejected the defendant's claim that these actions by the police constituted an illegal arrest, instead concluding that the actions were all part of a legitimate investigative detention. In reaching this conclusion, the OAJC found that the officers had reasonable suspicion to stop the defendant initially and then stated:

> The remaining actions during the *Terry* stop constituted permissible preservation of the status quo while the officer confirmed or dissipated his suspicions. The preservation of the status quo occurred: while the officer retrieved [Appellant's] identification to confirm the identity of the appellant; by placing appellant in the police car during this

overriding considerations of public safety justified Trooper Tretter's failure to provide Appellant with *Miranda* warnings before asking him the limited question regarding the woman's whereabouts while Appellant was in the patrol car. Based on the call from Appellant's neighbor, Trooper Tretter and Trooper Rutter believed that they were responding to a violent domestic dispute. When they arrived at the scene, the troopers not only observed damaged property, but also saw blood on the neighbor's front door, on a jacket left in the yard, and on the door of Appellant's residence. The troopers then received a confusing account of events from Appellant. Given these circumstances, the troopers could not be certain of the extent of danger before them nor could they be sure of the safety of the alleged woman involved in the reported domestic violence incident. In addition, once Appellant was placed in the patrol car, Trooper Tretter asked Appellant a very focused question, aimed at discovering the whereabouts of the alleged woman. Based on these circumstances, we conclude that the troopers were not attempting to elicit an incriminating response from Appellant when they placed him in the patrol car and asked him about the woman's location, but rather, were motivated solely by a concern for their own safety and the

nighttime street encounter in a high-crime area while his identification was checked; and when appellant was handcuffed after he tried to escape before the check on identification was completed. *Id.* at 149. The OAJC then apparently applied this analysis in rejecting Appellant's subsequent claim that his statements made in the patrol car before he was given *Miranda* warnings should have been suppressed, stating that "the record reflects that [the statements] did not occur as the result of custodial interrogation." *Id.* at 150.

*Gwynn* does not control our inquiry here. In the first instance, *Gwynn* is only an opinion announcing the judgment of the Court, and its reasoning is therefore not binding on this Court. *See C & M Developers v. Bedminster Twp. ZHB*, 573 Pa. 2, 820 A.2d 143, 152 (2002) (opinion announcing judgment of court is not binding precedent). Second, the standard for determining whether a person has been placed in custody is based on the particular circumstances of each case, *see Commonwealth v. Ziegler*, 503 Pa. 555, 470 A.2d 56, 58 (1983), and there can be no doubt that the circumstances in *Gwynn* are completely different than those in the instant case. In any event, even if *Gwynn* were to control our inquiry here, in that it could somehow be read as establishing the broad proposition that an individual who is handcuffed and placed in a patrol car is not in "custody" for any purpose, this Court has clearly taken a contrary position in this opinion today.

safety of the alleged woman. *See Quarles,* 467 U.S. at 657, 104 S.Ct. 2626 (concluding that "the need for answers to questions in a situation posing a threat to the public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination"); *see also Commonwealth v. Bowers,* 400 Pa.Super. 377, 583 A.2d 1165, 1171 (1990) (recognizing the reasoning in *Quarles* ). Accordingly, Appellants statements to Trooper Tretter were admissible under the public safety exception and thus were properly admitted by the trial court. *See Quarles,* 467 U.S. at 655–57, 104 S.Ct. 2626; *Stewart,* 740 A.2d at 719–20.

Appellant also claims that the trial court erred in refusing to suppress a portion of his statement to the police because it was elicited in violation of the "six-hour rule" set forth in *Commonwealth v. Davenport,* 471 Pa. 278, 370 A.2d 301 (1977). Specifically, Appellant argues that because he was taken into police custody at approximately 12:35 a.m., the statement he made to Corporal McAndrew more than six hours later, at approximately 7:10 a.m., should have been suppressed. However, in light of the fact that a majority of this Court recently abandoned the six-hour rule in *Commonwealth v. Perez,* 845 A.2d 779, 2004 WL 576101 (Pa.2004), Appellant's claim fails.

The Pennsylvania Rules of Criminal Procedure require that an individual who has been arrested "shall be afforded a preliminary arraignment by the proper issuing authority without unnecessary delay." Pa.R.Crim.P. 516(A). While this requirement is not constitutionally mandated, it ensures that a defendant is afforded the constitutional rights embodied in Pennsylvania Rule of Criminal Procedure 540, which requires the issuing authority to: (1) read the complaint to a defendant to inform him of the nature of the charges against him, Pa. Const. art. I, § 9; (2) inform him of his right to counsel, U.S. Const. Amends. VI, XIV, Pa. Const. art. I, § 9; and (3) inform him of his right to reasonable bail, Pa. Const. art. I, § 14. Pa.R.Crim.P. 540; *Perez,* 845 A.2d 779, 783.

Prior to our decision in *Perez,* this Court's approach to the prompt arraignment requirement was governed by our deci-

sions in *Davenport* and *Commonwealth v. Duncan*, 514 Pa. 395, 525 A.2d 1177 (1987). First, in *Davenport*, this Court established a rule under which the admissibility of any statement taken while the defendant was in custody, but before his preliminary arraignment, depended on the length of the delay between the defendant's arrest and his arraignment. We stated:

> If the [defendant] is not arraigned within six hours of arrest, any statement obtained after arrest but before arraignment shall not be admissible at trial. If the accused is arraigned within six hours of arrest, pre-arraignment delay shall not be grounds for suppression of such statements except as the delay may be relevant to constitutional standards of admissibility.

*Davenport*, 370 A.2d at 306. The Court adopted this bright-line approach in order to "assure more certain and even-handed application of the prompt arraignment requirement, and [to] provide greater guidance to trial courts, the bar and law enforcement authorities." *Id.*

However, a decade later, in *Duncan*, this Court explained that although the Court's adoption of the six-hour rule was meant to provide a workable rule with which law enforcement could readily comply, "our experience with the *per se* application of the rule has proven to the contrary." *Duncan*, 525 A.2d at 1182. The *Duncan* Court recognized that the *Davenport* rule had "been applied on a mechanical basis to violations which bear no relationship to the statement obtained and has shielded the guilty for no reason relevant to the individual circumstances of their case." *Id.* at 1182. In response, the Court held that to better achieve the goals of *Davenport* "to guard against the coercive influence of custodial interrogation, [and] to ensure that the rights to which an accused is entitled at preliminary arraignment are afforded without unnecessary delay," the focus when determining whether to suppress an incriminating statement, "should be on *when* the statement was obtained, *i.e.*, within or beyond the six-hour period." *Id.* (emphasis in original). Thus, the *Davenport* rule was modified to allow admission of statements that were made by the

accused within six hours of his arrest, regardless of when the arraignment occurred. *Id.*

This Court recently reconsidered the *Davenport-Duncan* rule in *Commonwealth v. Perez*, 845 A.2d 779, where a majority of the Court concluded that the "application of a stringent bright-line rule to the vastly different sets of circumstances that may be involved in arrest, investigation, and arraignment has yielded perplexing results. . . ." *Id.* at 784. Thus, the majority abandoned the six-hour rule and held that "voluntary statements by an accused, given more than six hours after arrest when the accused has not been arraigned, are no longer inadmissible *per se.*" *Id.* at 787. Instead, the majority in *Perez* concluded that courts should look to the totality of the circumstances to determine whether a pre-arraignment statement was freely and voluntarily made, and therefore admissible.[13] *Id.* The majority explained that, in making this determination, courts should consider factors such as the attitude exhibited by the police during the interrogation, whether the defendant was advised of his constitutional rights, whether he was injured, ill, drugged or intoxicated when he confessed, and whether he was deprived of food, sleep, or medical attention during the detention.[14] *Id.* at 784–86.

**13.** This author dissented from the *Perez* majority's decision to abandon the *Duncan–Davenport* rule, stating:

> In the absence of reasonable and clear time restraints in which police officers are allowed to question suspects, suspects are much more likely to be exposed to the coercive effect of prolonged police interrogation, which in turn, will yield a greater pool of unreliable confessions. By using time restrictions to curb police officers' potential abuse of the interrogation process, the *Duncan–Davenport* rule, in my view, better safeguards the constitutional rights of defendants than the new 'totality of the circumstances' approach adopted by the majority today and thus, should not be abandoned.

*See Perez*, 845 A.2d at 791 (Nigro, J., concurring and dissenting). However, given that a majority of this Court abandoned the six-hour rule in favor of the approach delineated in *Perez*, that holding applies to the instant case.

**14.** Additional factors to be considered include the age of the accused, his level of education and intelligence, the extent of his previous experience with the police, the repeated and prolonged nature of the questioning, and the length of detention prior to the confession. *See*

Applying *Perez* to the instant case,[15] we find that the totality of the circumstances demonstrates that Appellant's statement to Corporal McAndrew was voluntarily given and therefore properly admitted at trial. In the first instance, there is nothing in the record to indicate that the delay in Appellant's arraignment was aimed at overcoming Appellant's will, or that the police utilized any coercive tactics to persuade him to give a statement. At trial, Corporal McAndrew testified to the circumstances surrounding Appellant's confession and indicated that Appellant was informed of his constitutional rights before he spoke to the officers, was permitted to use the bathroom and was given coffee and a blanket during the interview, and was not injured or under the influence of drugs or alcohol when he made the confession. *See* N.T., 11/19/2002, at 261–301. Moreover, the record shows that Appellant himself was responsible for part of the delay as he spent the first hours of the interview providing a statement that he later partially recanted in the follow-up statement at issue here. *See Perez*, 845 A.2d 779, 787–88 (noting that the appellant's deception to the police about his identity and his age contributed to the delay in processing his case). Under these circumstances, we find that Appellant's statement to Corporal McAndrew was voluntarily given and therefore admissible pursuant to *Perez*.

As we find that Appellant's claims for relief are without merit, we must, in compliance with our statutory duty pursuant to 42 Pa.C.S. § 9711(h)(3), affirm his sentences of death unless we determine that (1) the sentences were the product of passion, prejudice or any other arbitrary factor or (2) the evidence fails to support the finding of at least one aggravating factor with respect to each murder. 42 Pa.C.S. § 9711(h)(3). Based upon our review of the record, we conclude that the sentences of death were not the product of passion, prejudice or any other arbitrary factor, but rather,

*Perez*, 845 A.2d at 785–86 (citing *People v. Cipriano*, 431 Mich. 315, 429 N.W.2d 781, 790 (1988)).

**15.** This Court explicitly stated in *Perez* that the new totality of the circumstances standard would apply to "all pending cases where the issue has properly been raised." *Id.* at 788.

were based on evidence properly admitted at trial. We also conclude that the evidence was sufficient to support the finding of at least one aggravating factor with respect to each murder. Specifically, regarding the murder of Mendez, the evidence showed that Appellant was convicted of the first-degree murder of Lopez, which was committed at the time of the murder of Mendez. *See* 42 Pa.C.S. § 9711(d)(11). Likewise, regarding the murder of Lopez, the evidence showed that Appellant was convicted of the first-degree murder of Mendez, which was committed at the time of the murder of Lopez. *See id.*

Accordingly, we affirm Appellant's convictions and the sentences of death.[16]

Former Justice Lamb did not participate in the decision of this case.

Chief Justice CAPPY files a concurring opinion.

Justice CASTILLE files a concurring opinion which joins the majority opinion in part.

Justice NEWMAN files a concurring opinion.

Justice EAKIN files a concurring opinion.

Justice SAYLOR files a dissenting opinion.

Chief Justice CAPPY, Concurring.

Appellant asserts that the statements elicited without benefit of his constitutional rights pursuant to *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) should have been suppressed. Insofar as the majority disposes of this claim under federal law, I am compelled to join as I recognize that *New York v. Quarles,* 467 U.S. 649, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984), requires that result. Although Appellant makes a perfunctory statement that this claim is raised under the Pennsylvania Constitution, beyond that boilerplate asser-

---

**16.** The Prothonotary of the Supreme Court is directed to transmit the complete record of this case to the Governor of Pennsylvania. *See* 42 Pa.C.S. § 9711(i) (Supp.1997).

tion he offers no independent argument under our state constitution. Accordingly, the question of the viability of *Quarles,* and the public safety exception to the right against self-incrimination, under our state constitution is left for another day.

Additionally, I note my disagreement with the majority's depiction of this claim as one being considered under a prejudice analysis. (Majority opinion at p. 789–90). As the assertion of error presents a claim of trial error, I believe that it is subject to a harmless error analysis. *Commonwealth v. Howard,* 538 Pa. 86, 645 A.2d 1300, 1307 (1994) (discussing the difference between a harmless error analysis and a prejudice analysis); *see also Commonwealth v. Baez,* 554 Pa. 66, 720 A.2d 711, 720 (1998) (denial of pre-trial motion to suppress subject to harmless error analysis). However, as I agree with the majority that there is no error, any discussion of the standard for assessing the consequences of that error is unnecessary.

In all other respects I join the lead opinion.

Justice CASTILLE, Concurring.

I join the lead opinion except in the following respects, all of which concern the admissibility of the inculpatory statement appellant made in the patrol car.

This case does not pose the more common "custody" and "interrogation" questions seen in cases involving *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The case does not involve the classic formal arrest, transport to police headquarters, and extended incommunicado interrogation which gave rise to the Supreme Court's adoption of a requirement of prophylactic warnings. Ultimately, I believe that we need not determine how the case would fit within the classic *Miranda* paradigm because, for the reasons well-expressed by the lead opinion, the question of the admissibility of appellant's statement is controlled by the public safety exception to *Miranda* which was established in *New York v. Quarles,* 467 U.S. 649, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984).

Along the way to its conclusion that *Quarles* controls, however, the lead opinion makes some findings and statements concerning the status of the law under *Miranda* with which I am in sufficient disagreement as to occasion this concurrence.

First, I disagree with the lead opinion's analysis of the contours of the federal constitutional test for determining "custody" for purposes of *Miranda*. The lead opinion states that "appellant was clearly deprived of his freedom of action," and therefore, was in "custody" for purposes of *Miranda*. Op. at 228–29, 855 A.2d at 790. This is not the proper federal test. As I noted in my Dissenting Opinion in *In Re R.H.*, 568 Pa. 1, 791 A.2d 331 (2002):

An individual is not in custody for *Miranda* purposes simply because his freedom of action has been restricted in a significant way or he reasonably believes that his freedom of action or movement has been restricted by the questioning. The U.S. Supreme Court—which is the ultimate authority on the interpretation of *Miranda* questions—has held that, in determining whether an individual was in custody, the ultimate inquiry is . . . whether there [was] a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest. *See Stansbury v. California*, 511 U.S. 318, 322, 114 S.Ct. 1526, 1528–29, 128 L.Ed.2d 293 (1994) (citations omitted). [T]he initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned. *Id.* at 323, 114 S.Ct. at 1529. Thus, not every mere deprivation of an individual's freedom of action triggers *Miranda's* constitutional protections, and the subjective sentiments of the person being interrogated are wholly irrelevant to the objective custody inquiry.

In *Berkemer v. McCarty*, 468 U.S. 420, 440, 104 S.Ct. 3138, 3150, 82 L.Ed.2d 317 (1984), for example, the Supreme Court held that *Miranda* warnings were not required prior to the roadside questioning of a motorist detained in a traffic stop. Although the Supreme Court recognized that a traffic stop significantly curtails the 'freedom of action' of

the driver, and that, under the law of most states, it is in fact a crime to drive away without permission, it emphasized that this was not the end of the *Miranda* custody inquiry. Fidelity to the doctrine announced in *Miranda* requires that it be enforced . . . only in those types of situations in which the concerns that powered the decision are implicated. *Id.* at 437, 104 S.Ct. at 3148–49. The Supreme Court found that the fact that traffic stops are typically temporary and brief, are conducted in public, and usually involve only one or at most two policemen mitigate[d] the danger that a person questioned will be induced 'to speak where he would not otherwise do so freely.' *Id.* at 437, 104 S.Ct. at 3149 (quoting *Miranda,* 384 U.S. at 467, 86 S.Ct. at 1624). *Id.* at 338 (Castille, J. dissenting); *accord Quarles,* 467 U.S. at 655, 104 S.Ct. at 2631 ("the ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest") (quoting *California v. Beheler,* 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275 (1983) (*per curiam* ) (quoting *Oregon v. Mathiason,* 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714 (1977) (*per curiam* ))). Because I believe that the lead opinion misconstrues the controlling test, I also believe that the lead opinion is mistaken in its extended criticism of the plurality decision in *Commonwealth v. Gwynn,* 555 Pa. 86, 723 A.2d 143 (1999), and I necessarily disagree with the broad and contrary custody holding the lead opinion would announce to supplant the non-precedential decision in *Gwynn.* *See* Op. at 229–30 n. 12, 855 A.2d at 790–91 n. 12.[1]

In my view, the question of custody for *Miranda* purposes under the proper test in these unusual circumstances is a close one, but ultimately, it is a question this Court need not resolve. This is so because even if it is assumed that appellant was in custody when police temporarily placed him in the

1. In any event, discussion of *Gwynn* is unnecessary to the decision of this case because (1) as the lead opinion notes, *Gwynn* is a plurality opinion with no precedential value; and (2) it is not apparent that, in the portion of the plurality opinion to which the lead opinion takes exception, the *Gwynn* Court was speaking of "custody" rather than "interrogation."

patrol car so that they could "freeze the situation" while they investigated this late-night report of an incident of domestic violence-a report corroborated by the on-scene cooperation of the reporting witness and the presence of blood on the doors of the two neighboring homes, as well as on a jacket found between the homes—the *Quarles* public safety exception obviated the necessity for police to recite *Miranda* warnings before asking appellant the single question they posed, a question which was designed to locate and thereby secure the safety of the woman police had reason to believe was a victim of domestic violence.

I also write to highlight the importance of undertaking the appropriate constitutional analysis when determining whether or not "interrogation" has occurred in a given case. As the United States Supreme Court articulated in *Rhode Island v. Innis*, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980):

> [T]he term interrogation under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. . . . But, **since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response.**

*Id.* at 301–02, 100 S.Ct. at 1689–90 (bold emphasis added). Thus, the absence of *Miranda* warnings does not require suppression of a suspect's custodial statement if, for example, the suspect spontaneously "blurts out" the statement, *Commonwealth v. Baez*, 554 Pa. 66, 720 A.2d 711, 720–21 (1998); or makes an incriminating statement in the course of "small talk" with authorities, *Commonwealth v. Abdul–Salaam*, 544 Pa. 514, 678 A.2d 342, 351 (1996); or is merely responding to biographical questioning, *Commonwealth v. Daniels*, 537 Pa.

464, 644 A.2d 1175, 1181 (1994); or makes an incriminating statement after voluntarily initiating communication with the authorities, *Commonwealth v. Yarris*, 519 Pa. 571, 549 A.2d 513, 523–24 (1988); or makes an incriminating statement in response to a declaration, rather than an inquiry, on the part of the authorities, *Commonwealth v. Brantner*, 486 Pa. 518, 406 A.2d 1011, 1015–16 (1979). In addition, even a statement elicited in direct violation of *Miranda* may be admissible for impeachment purposes. *Harris v. New York*, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971). Moreover, a concern for thorough examination of the question of interrogation is particularly appropriate in a close case, such as that *sub judice*, where, as the lead opinion aptly notes: "[T]he troopers were not attempting to elicit an incriminating response from Appellant when they placed him in the patrol car and asked him about the woman's location." Op. at 230–31, 855 A.2d at 791.

Finally, I do not join in the lead opinion's preliminary finding that appellant's failure to demonstrate "undue prejudice" from the admission into evidence of the statement in question would defeat his claim if it otherwise had merit. Presumably, if the statement were obtained in violation of *Miranda*, the burden would be on the Commonwealth to prove that its admission was harmless beyond a reasonable doubt. *See Chapman v. California*, 386 U.S. 18, 23–24, 87 S.Ct. 824, 827–28, 17 L.Ed.2d 705 (1967). However, because the statement was properly admitted, and more importantly, because the Commonwealth has not argued harmless error, there is no reason to address the question of the effect of a non-existent error. *See Berkemer*, 468 U.S. at 443–445, 104 S.Ct. at 3152–54 (citing *Chapman* and refusing to apply harmless error standard, or even decide whether harmless error standard could apply to *Miranda* violation, where state did not argue harmless error).

With the exception of the foregoing concerns, I join the lead opinion.

Justice NEWMAN, Concurring.

Although I agree with the decision to affirm the convictions and sentences, I do not agree with the determination that the

"public safety exception" applies to the statement Appellant made in the police car.

As the Opinion Announcing the Judgment of the Court correctly concludes, the interrogation leading to Appellant's confession in the police car, while he was handcuffed and in the back seat, was custodial in nature and presumptively required *Miranda* warnings.[1] *Commonwealth v. Williams*, 539 Pa. 61, 650 A.2d 420 (1994). Nevertheless, "*Miranda* warnings ... are not required in certain situations where the police ask questions to ensure public safety and not to elicit incriminating responses." Opinion Announcing the Judgment of the Court at 9 (citing *Quarles*, 467 U.S. at 655–57, 104 S.Ct. 2626; *Commonwealth v. Stewart*, 740 A.2d 712, 719–20 (Pa.Super.1999)). The Opinion Announcing the Judgment of the Court determines that the instant matter presents one of these situations, in which "overriding considerations of public safety justified Trooper Tretter's failure to provide Appellant with *Miranda* warnings before asking him the limited question regarding the woman's whereabouts...." Opinion Announcing the Judgment of the Court at 791. The public safety concerns considered included: (1) the troopers thought that they were responding to a violent domestic dispute; (2) they saw blood on the front door; and (3) Appellant gave a "confusing account" of the events that had transpired.

I do not find these circumstances to be ones that justify the "narrow exception" that the Supreme Court articulated in *New York v. Quarles*, 467 U.S. 649, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984), which involved a real and immediate threat to public safety, consisting of circumstances far more exigent than the ones here. *Id.* at 650, 104 S.Ct. 2626. In that case, a woman approached two police officers and told them she had just been raped, described her assailant, and informed them that the man had just entered a nearby supermarket and was carrying a gun. One officer entered the store, saw a man who matched the description, witnessed the suspect run, ordered him to stop, frisked him, and discovered he was wearing an

---

1. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

empty holster. After handcuffing the suspect, the officer asked him where the gun was, and the suspect gestured and said "over there." The officer retrieved the gun, arrested the suspect, and then read him his rights. The Supreme Court stated that:

> **The police in this case, in the very act of apprehending a suspect, were confronted with the immediate necessity of ascertaining the whereabouts of a gun which they had every reason to believe the suspect had just removed from his empty holster and discarded in the supermarket.** So long as the gun was concealed somewhere in the supermarket, with its actual whereabouts unknown, it obviously posed more than one danger to the public safety: an accomplice might make use of it, a customer or employee might come upon it.

*Quarles*, 467 U.S. at 657, 104 S.Ct. 2626 (emphasis added).

The situation in the instant matter stands in stark contrast to the one in *Quarles*. When police took Appellant into custody, they were responding first to a report of domestic violence and then to an inconsistent claim by Appellant that he was the victim of an attack by two men. Unlike *Quarles*, there was no identified victim, no report of a gun at the scene, and no contemporaneous crime being witnessed. Further, Appellant was already handcuffed and placed in the back seat of the patrol car when he was questioned and blurted out his confession. Clearly, Appellant did not pose a threat to public safety, and, while police knew that something bad had happened, Appellant himself was a self-described crime victim, and there were no weapons or armed suspects known to be present. It strains credulity in these circumstances to hold that the "narrow exception" based on public safety articulated in *Quarles* applies.

Although I believe that the police car confession was not admissible, I agree with the result and would not reverse the determination on guilt because there is sufficient evidence of record, including a second confession and Appellant's inculpa-

tory testimony,[2] to support the conviction even in the absence of the first statement.[3]

Justice EAKIN, Concurring.

I join the lead Opinion in affirming appellant's convictions and sentences of death. However, with respect to the admissibility of appellant's statement made in the patrol car, I do not believe we need to reach the public safety exception to *Miranda* to resolve the issue, as no interrogation occurred. *Miranda* warnings are necessary only when a defendant is subject to custodial interrogation. I agree that appellant, in handcuffs in a patrol car, was in custody. I do not agree that he was interrogated.

Interrogation of course "refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Commonwealth v. DeJesus*, 567 Pa. 415, 787 A.2d 394, 402 (2001) (citing *Rhode Island v. Innis*, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980)). The likelihood of an incriminating response to this single non-accusatory question of the woman's whereabouts was slim. Such was not the design of the inquiry, and hence *Miranda* warnings were not required.

Trooper Tretter's question was based on his logical belief that he had responded to a domestic dispute. Seeing blood, he was understandably anxious to define what he faced, and asked one question about the location of another potential party. He did not ask appellant what he had done, how he had done it, why he had done it; he didn't even ask "what happened here?" He did nothing at all designed to elicit

2. Appellant testified that he shot the two victims. The pathologist who performed the autopsies testified that each victim had been shot in a vital part of the body. Specific intent can be inferred where a defendant uses a deadly weapon upon a vital part of the victim's body. *Commonwealth v. Washington*, 547 Pa. 563, 692 A.2d 1024 (1997).

3. Appellant has not raised any issue based on the fruit of the poisonous tree doctrine, regarding evidence obtained as a result of the police car confession.

incriminating information; the fact that the answer he got was incriminating is not the measure of the question itself. As it was not designed to elicit an incriminating response, the question itself simply did not rise to the level of interrogation. There being no interrogation, *Miranda* warnings were not necessary, and we need not address whether an exception to *Miranda* is implicated—*Miranda* itself is not implicated.

Justice SAYLOR, Dissenting.

Recently, I supported the abandonment of the Court's former, prophylactic, bright-line six-hour rule constraining custodial, police interrogation in the absence of prompt arraignment, because I believed that the pattern of continually expanding and evolving exceptions engrafted onto the rule had left it in such an impaired condition that it had the potential to do more harm than good. *See Commonwealth v. Perez*, 577 Pa. 360, 381–82, 845 A.2d 779, 792–93 (2004) (Saylor, J., concurring and dissenting); *accord Commonwealth v. Bridges*, 563 Pa. 1, 47, 757 A.2d 859, 883 (2000) (Saylor, J., concurring) (expressing the view that "continuation of a rule so readily capable of avoidance as to function as no rule at all ... carries with it the potential for diminishing respect for the courts' authority in the eyes of those subject to their lawful mandates"). I also took the position, however, that the change should be implemented prospectively, as this approach would best serve the orderly administration of justice and maintain essential fairness. *See Perez*, 577 Pa. at 381–82, 845 A.2d at 792 (Saylor, J., concurring and dissenting).

A substantial disadvantage of the *Perez* Court's decision retroactively to replace the *Davenport/Duncan* six-hour rule with a totality-of-the-circumstances approach is made apparent by this case. The focus of the parties' efforts below was on developing a record concerning the six-hour rule that represented the prevailing law of the Commonwealth as of the time of the interrogation at issue.[1] Thus, there does not appear to have been a directed attempt to build a full and complete

1. Although Appellant could have presented a totality approach as an alternative basis for his claim, he certainly was entitled to style his

record regarding this issue of the knowing, voluntary, and intelligent character of Appellant's statements, which *Perez* has retrospectively converted into the exclusive inquiry of the case, or any decision on the part of the trial court pertaining to the now-central question. Furthermore, the majority's present effort to perform the necessary assessment for the first time on appellate review on the cold and at least potentially incomplete record before it is inconsistent with its own pronouncements concerning the character of its appellate function.[2]

Although I recognize that I am bound by *Perez* in terms of the retroactive elimination of the *Davenport/Duncan* six-hour rule, I would defer the present matter, in the first instance, to the post-conviction setting. There, at least the parties may be afforded the opportunity to complete the record concerning the totality of the circumstances surrounding Appellant's interrogation, and the necessary fact finding can be accomplished in a more appropriate forum.

claim according to other prevailing law as established by this Court, i.e., the *Davenport/Duncan* six-hour rule.

**2.** *See, e.g., Commonwealth v. Jackson,* 464 Pa. 292, 297–98, 346 A.2d 746, 748 (1975) ("The record before us contains no findings of fact or conclusions of law, only a statement of the suppression court's conclusion that there was no coercion[;] ... [t]his court does not in the first instance make findings of fact and conclusions of law."); *accord Commonwealth v. Grundza,* 819 A.2d 66, 68 (Pa.Super.), *appeal denied,* 574 Pa. 764, 832 A.2d 435 (2003) (same); *cf. Thompson v. City of Philadelphia,* 507 Pa. 592, 599, 493 A.2d 669, 672–73 (1985) ("An appellate court by its nature stands on a different plane than a trial court. Whereas a trial court's decision to grant or deny a new trial is aided by an on-the-scene evaluation of the evidence, an appellate court's review rests solely upon a cold record. Because of this disparity in vantage points an appellate court is not empowered to merely substitute its opinion concerning the weight of the evidence for that of the trial judge."). Notably, the Court has recently based substantial alterations to the review process on the distinction between the roles of appellate versus original jurisdiction courts in terms of their respective abilities relative to fact finding. *See, e.g., Commonwealth v. Grant,* 572 Pa. 48, 66, 813 A.2d 726, 737 (2002); *see also Commonwealth v. Freeman,* 573 Pa. 532, 543–44, 827 A.2d 385, 392 (2003).