**COMMONWEALTH of Pennsylvania,**
**Appellee,**

v.

**Randall AUSTIN, Appellant.**

Superior Court of Pennsylvania.

Argued March 21, 2006.
Filed Aug. 21, 2006.

Steven G. Laver, Philadelphia, for appellant.

Hugh J. Burns, Jr. and Mary Huber, Asst. Dist. Atty's, Philadelphia, for Com., appellee.

BEFORE: TODD, BENDER and GANTMAN, JJ.

OPINION BY BENDER, J.:

¶ 1 This is an appeal from a judgment of sentence imposed upon Appellant after he was convicted of second degree murder, attempted murder, aggravated assault and false reports to authorities. Appellant raises four issues for our consideration. We rephrase them as follows:

Was the evidence sufficient to sustain Appellant's conviction for second degree murder (felony murder) where the jury acquitted Appellant of robbery, the underlying and predicate felony supporting the charge of second degree murder;

Was Appellant's conviction for second degree murder against the weight of the evidence;

Did the court commit reversible error in refusing to instruct the jury on voluntary manslaughter based upon unreasonable belief, where there was sufficient evidence to warrant such a charge; and

Was the evidence sufficient to sustain Appellant's conviction for attempted murder?

¶ 2 Upon careful consideration of the issues raised herein, we reverse the conviction for second degree murder and remand for a new trial as to a charge of third-degree murder and/or criminal homicide.

¶ 3 The charges in the present case stem from the shootings of Damon Williams and Tyree Griffith, two men from New Castle, Delaware, on April 14, 2002, on North 34th Street in Philadelphia. In the case of Damon Williams, the shooting proved fatal. On that evening, Philadelphia Police Officer Craig Richardson was on routine patrol and was confronted by two women as he approached the intersection of 38th and Girard Streets in Philadelphia. The two women told Officer Richardson that there had been a shooting on the 1100 block of North 34th Street, a street that runs along

the border of the Philadelphia Zoo. Officer Richardson proceeded to that location and, upon his arrival, observed two men. One of the men, later identified as Damon Williams, who was only 18 years old, was crawling backwards across the street. By the time Officer Richardson reached Williams, the young man displayed no pulse or signs of life. The other man, Tyree Griffith, was found lying half inside a Buick LeSabre and half outside. Griffith was moaning in pain when approached by Officer Richardson and told the officer that a man named "Iran" had shot him and had then driven off in a silver Mercedes.

¶ 4 According to testimony provided at trial by Griffith, Griffith had known Appellant for a few years prior to the shooting, as Appellant had sold Griffith drugs on several occasions. On April 14, 2002, Griffith had called Appellant and told him that his younger brother, Williams, wished to buy a "brick" of cocaine, a much larger amount than Griffith's previous purchases. Griffith and Appellant agreed upon a price $10,500 for the brick and Appellant instructed Griffith to meet him at the same location the prior drug exchanges had taken place, on 34th Street bordering the zoo. Later in the day, Williams and Griffith drove from Delaware to meet Appellant with a bag containing the agreed upon purchase price. As they approached the zoo, Griffith phoned Appellant to notify him that they were approaching the exchange site. Williams was driving a Buick LeSabre and Griffith was in the passenger seat. Williams parked the vehicle and waited for Appellant to arrive. When Appellant pulled up behind Williams' vehicle, Williams and Griffith got out of the car and approached Appellant's vehicle. Appellant stated that he wanted to talk to Williams. Williams then entered the vehicle and had a short conversation with Appellant while Griffith returned to the LeSabre and sat down in the passenger seat.

Williams then exited Appellant's vehicle and displayed a frown upon his face.

¶ 5 Upon reentering his own vehicle, Griffith asked Williams what was wrong. Williams responded that he believed that Appellant was "bullsh——ting" and really did not have the drugs he had promised. Appellant then called Griffith on Griffith's walkie-talkie and asked Griffith what was wrong with his brother. Griffith stated that his brother was just trying to do some business and get back to Delaware. Appellant then said "hold on. Here I come." Appellant then retrieved a duffle bag from his trunk, approached Williams' vehicle, opened the rear door of Williams' vehicle and entered the vehicle and sat down next to Williams, who was seated in the back seat. The two men began talking while Appellant stuck his hand inside the duffle bag. Suddenly Appellant grabbed Williams, drew a handgun from the duffel bag and said "give the shit up." Williams began struggling to get away from Appellant and was able to get the door to the vehicle open when Appellant fired a single shot into William's lower back. As Williams was struggling to get free from Appellant, he was simultaneously trying to lift the armrest between the two front seats to retrieve a gun he had placed in that spot. At the time Williams was shot, Griffith saw the gun and grabbed it and fired a shot into the back seat toward Appellant. Both men then exited the vehicle and exchanged fire before fleeing, Griffith away from the car and Appellant toward his own vehicle. Griffith then noticed Appellant return to Williams' car where he retrieved the bag which contained the money intended for the drugs. Appellant then returned to his own vehicle and drove away from the scene.

¶ 6 Appellant had been struck in the hand by the bullet fired by Griffith

prompting him to seek medical treatment for the wound. Appellant went to Fitzgerald Mercy Hospital for treatment whose staff notified the police that they were treating a gunshot wound. Upon questioning by the police, Appellant told them that his name was "Dontey Tucker" and that he had been shot while being robbed at 71st and Woodland Avenues.

¶ 7 The police investigation of the scene of the shooting resulted in the recovery of three 9 mm. casings and one .38 caliber projectile. A .38 caliber handgun was found on the grounds of the Philadelphia Zoo. Griffith indicated that the gun he had taken from his brother, and then later thrown onto zoo property, was a .38 caliber. Appellant indicated that the weapon he used was a 9 mm. Police also recovered a blood sample in the back seat of the Buick that was later matched to Appellant.

¶ 8 Appellant was charged with murder, attempted murder, robbery, aggravated assault and making false reports to police and was tried before a jury in a trial commencing March 29, 2005, and concluding on April 5, 2005. At trial, Appellant took the witness stand and offered a very disparate version of the events of the shooting than did Griffith. Appellant testified that after talking with Williams in his vehicle he retrieved the drugs from his trunk and entered the back seat of Williams' car to complete the transaction. When Appellant began to retrieve the drugs from his duffle bag he noticed Williams making a move for a handgun in his waistband. Seeing this, Appellant simultaneously made a pushing/grabbing motion at Williams while drawing his handgun from his waistband. Upon removing his handgun, Appellant shot a single round into Williams' back. At that point in time, Griffith grabbed the gun from Williams and shot one round at Appellant, which struck him in the hand. Appellant jumped out of the car and fired a couple of shots in Griffith's direction before running to his Mercedes and fleeing the scene.

¶ 9 At the conclusion of the trial, Appellant was found guilty of murder of the second degree, attempted murder, aggravated assault and making false reports to police. However, Appellant was found not guilty of robbery. Due to his acquittal of robbery, the predicate offense for second degree murder, Appellant filed a motion for extraordinary relief contending that the evidence was insufficient to support the conviction for second degree murder and also that the conviction was against the weight of the evidence. Appellant's motion for extraordinary relief was denied on May 16, 2005, and Appellant proceeded to sentencing where he was sentenced to life imprisonment on the felony murder charge, a consecutive sentence of 20 to 40 years' imprisonment for attempted murder and a concurrent sentence of one to two years imprisonment for making false reports. The present appeal followed.

■ ¶ 10 Appellant first contends that the evidence was insufficient to sustain his conviction on second degree murder (felony murder) where the jury acquitted him of a charge of robbery which operated as the predicate felony for the charge of felony murder. The statutory definition of second degree murder provides:

§ 2502. Murder

. . .

(b) Murder of the second degree.— A criminal homicide constitutes murder of the second degree when it is committed while defendant was engaged as a principal or an accomplice in the perpetration of a felony.

"Perpetration of a felony." The act of the defendant in engaging in or being an accomplice in the commission of, or an attempt to commit, or flight after committing, or attempting to commit rob-

bery, rape, or deviate sexual intercourse by force or threat of force, arson, burglary or kidnapping.

18 Pa.C.S. § 2502.

¶ 11 While acknowledging that the robbery of Williams and Griffith was the predicate offense for the charge of felony murder, the Commonwealth contends that the verdict of the jury is nothing more than an inconsistent verdict and that, as such, no relief is due Appellant. The Commonwealth correctly asserts that a survey of the law overwhelmingly supports the premise that verdicts need not be consistent. Moreover, the Commonwealth points to cases from other jurisdictions which have held that an acquittal on a predicate felony will not impugn a guilty verdict on a charge of felony murder. While we agree in general with the Commonwealth's summary of the law, the Pennsylvania Supreme Court's recent decision in *Commonwealth v. Magliocco*, 584 Pa. 244, 883 A.2d 479 (2005), indicates that reliance upon general principles of law as they relate to inconsistent verdicts may not suffice to resolve the issue. Of course, to the extent that *Magliocco* departs from holdings of our sister states with respect to the effect of an acquittal of a predicate offense upon a conviction of the greater offense, *Magliocco* will trump the contrary decisions.

¶ 12 In *Magliocco*, Magliocco was charged with possession of an instrument of crime (PIC), ethnic intimidation and terroristic treats. After a bench trial, Magliocco was convicted of PIC and ethnic intimidation, but acquitted of terroristic threats. At the time in question, 18 Pa. C.S. § 2710(a) provided that one commits the offense of ethnic intimidation "if, with malicious intention toward the race ... of another individual or group of individuals, [one] commits an offense under any other provision of this article or under Chapter 33 ... or under section 3503 ... or under section 5504 ... with respect to such individual ... or with respect to one or more members of such a group." *Id.* at 489. The Supreme Court recognized that "the only potentially applicable predicate offense at issue in this case was Terroristic Threats, 18 Pa.C.S. § 2706," *id.*, an offense contained within the same article as ethnic intimidation. Thus, by virtue of the definition of the offense and by virtue of the manner in which Magliocco was charged, the offense of terroristic threats was the predicate offense for the offense of ethnic intimidation. Ostensibly, a conviction for ethnic intimidation could not lie unless the factfinder concluded that the predicate offense of terroristic threats had been "committed." Thus, the acquittal of terroristic threats presented a verdict that was internally inconsistent.

¶ 13 Magliocco appealed his judgment of sentence to this Court and attacked the conviction for ethnic intimidation on the basis that he had been acquitted of the predicate offense, terroristic threats. Magliocco contended that the acquittal of the predicate offense necessitated putting aside the conviction for ethnic intimidation. We agreed with Magliocco and vacated the judgment of sentence imposed on the ethnic intimidation conviction. The Commonwealth filed a petition for allowance of appeal, which was granted and the Supreme Court considered the question of whether a conviction for ethnic intimidation could stand when the defendant was charged with the predicate offense but acquitted of that offense.

¶ 14 Before the Supreme Court, Magliocco argued that "the evidence was insufficient to prove ethnic intimidation because the Commonwealth failed to establish that he committed terroristic threats. Magliocco maintained that a conviction—or at the very least a formal finding by the trier of fact that a defendant "committed" the

predicate offense by proof beyond a reasonable doubt, even if not convicted of it—is a necessary element to support a conviction for ethnic intimidation." *Id.* at 489. The Commonwealth countered "that the evidence it produced—that Magliocco threatened to kill the children and all other people of their race on the block, while brandishing a baseball bat—was sufficient to prove that he in fact committed terroristic threats, even though the bench trial judge specifically acquitted him of that crime." *Id.* at 490. The Commonwealth maintained that:

since an ethnic intimidation conviction requires a finding that the underlying offense was committed, the trial judge's guilty verdict on ethnic intimidation must be construed as representing a finding that Magliocco **committed** terroristic threats, even though she declined to **convict** him of it as a separate crime. Any inconsistency in the trial court's verdicts, the Commonwealth argues, is no basis for awarding relief upon a sufficiency of the evidence claim since consistency in verdicts is not required and an acquittal " 'cannot be interpreted as a specific finding in relation to some of the evidence.' " Commonwealth's Brief, 9–10, (quoting *Commonwealth v. Campbell*, 539 Pa. 212, 651 A.2d 1096, 1100 (Pa.1994)).

*Id.* The Commonwealth further argued that this Court had "misapprehended the plain language of the statute by reading the statutory phrase 'commits an offense' as if it read 'is convicted of an offense.' " *Id.* The Commonwealth contended that, "in Pennsylvania law, the term 'convicted' has a distinct meaning," *id.*, the essence of which was not merely an implicit finding of guilt on the predicate offense, but the actual return of a guilty verdict as to the predicate offense. The Commonwealth's argument essentially provided that since the legislature did not use the term "convicted of," but instead used the term "com-

mits," it was not necessary that a jury actually return a verdict of guilty of the underlying predicate offense to maintain a conviction for the greater offense.

¶ 15 Ultimately, the Court sided with Magliocco. In so doing, the Court did not appear to disagree with the general propositions of law forwarded by the Commonwealth. The Court states:

In forwarding its argument respecting the proper way to view the trial court's verdict, the Commonwealth speaks in terms of the broad legal principles governing a reviewing court's function, *i.e.*, the way in which the verdict must be construed, rather than looking to evidence of what the verdict in fact may have reflected.

*Id.* at 490 n. 9. Later the Court remarks:

We also agree with the Commonwealth that a mere facial inconsistency in verdicts is not a valid basis upon which to upset a conviction which is otherwise proper, since consistency in verdicts is not required.

*Id.* at 492. Indeed, the Court recognized that there was no requirement that the Commonwealth even charge the defendant with the underlying predicate offense in order to seek a conviction of the greater offense.

We agree with the Commonwealth that it was not required to secure a formal conviction for the predicate crime of terroristic threats in order to secure a conviction for ethnic intimidation based upon such terroristic threats. Indeed, as we read the statute, the Commonwealth need not formally charge the defendant with the predicate offense, as long as it makes clear which offense it is pursuing as the predicate offense for purposes of the ethnic intimidation charge, and the factfinder is so made aware and, in the case of a jury, so charged.

*Id.* However, the Court asserted that the circumstance is changed when the Commonwealth does charge the underlying predicate offense and an acquittal is rendered:

Our difficulty with the Commonwealth's position arises from the necessary effect of an actual acquittal of a crime in the admittedly unusual circumstance presented here, where that crime is both separately charged and prosecuted and is also a specific statutory element of another charged offense.

*Id.* at 492. In the Court's analysis, the reasoning was that:

Acquittals, of course, have been accorded a special weight in the law. *United States v. DiFrancesco,* 449 U.S. 117, 129–30, 101 S.Ct. 426, 433, 66 L.Ed.2d 328 (1980) ("The law 'attaches particular significance to an acquittal.' ") (citation omitted); *Commonwealth v. D.M.,* 548 Pa. 131, 695 A.2d 770, 772 (Pa.1997). Thus, in D.M., this Court stated:

A defendant enters a trial cloaked in the presumption of innocence and when the fact-finder reaches a verdict of acquittal, there is no justification to search for reasons to undermine the verdict. Such a defendant has achieved the strongest vindication possible under our criminal tradition, laws, and procedures[.]

*Id.* The Court wrapped up its discussion on the matter thusly:

To secure a conviction for any crime, the Commonwealth must prove all necessary elements beyond a reasonable doubt. *E.g. Commonwealth v. Cosnek,* 575 Pa. 411, 836 A.2d 871, 874 (Pa.2003). In order to find Magliocco guilty of ethnic intimidation in this case, the factfinder had to conclude beyond a reasonable doubt that, among other things, he actually "committed" the offense of terroristic threats. But, the Commonwealth did not merely allege that, for purposes of an ethnic intimidation prosecution, Magliocco committed terroristic threats with a malicious racial animus. Instead, the predicate offense was actually charged and actually prosecuted, and that prosecution resulted in an acquittal—a finding that, for whatever reason, the Commonwealth failed to prove beyond a reasonable doubt that the defendant "committed" terroristic threats. Given the special weight afforded acquittals, since the factfinder in this case specifically found that Magliocco did not commit the offense of terroristic threats, the conviction for ethnic intimidation, which requires as an element the commission beyond a reasonable doubt of the underlying offense, simply cannot stand. Accordingly, we affirm the Superior Court's vacatur of Magliocco's conviction for ethnic intimidation.

*Id.* at 492–93.

¶ 16 The question the instant case presents is whether Appellant's acquittal on the charge of robbery compels a similar result as *Magliocco, i.e.,* the reversal of his conviction for felony murder. As in *Magliocco,* there is no question or contention between the parties as to the applicable predicate for the greater offense of felony murder. Here, the predicate for felony murder is robbery. The Commonwealth contends that *Magliocco's* holding is "idiosyncratic" and limited to the ethnic intimidation statute. While we agree that the nuances of the various statutes must be dissected in order to determine whether *Magliocco* will control, we do not believe that the Supreme Court meant to strictly limit the principle behind the holding to the ethnic intimidation statute.

■ ¶ 17 In arguing that the *Magliocco* decision does not apply to the facts of the present case, the Commonwealth points out the subtle differences in the words or phrases which connect the predicate of-

fense to the greater offense in the two offenses in question. Ethnic intimidation required that the predicate offense be "committed" with malicious intent toward the race of an individual or group of individuals whereas felony murder requires that one kill another while "engaged in the perpetration of a felony." The Commonwealth correctly argues that the term "commits" is more restrictive than the phrase "engaged in the perpetration of a felony." The term "commit," or its variation "commission," connotes the completion of the offense whereas the term "engaged in the perpetration of" suggests that mere participation in a criminal attempt will suffice.[1] Of course, in the case of felony murder the operative phrase is actually defined and the statutory definition supports the thesis that "engaged in the perpetration of" is a broader phrase than the term "commit." The definition of the phrase engaged in the perpetration of includes the language "engaging in or being an accomplice in the commission of, or an attempt to commit, or flight after committing, or attempting to commit." Thus, by definition, in order to convict for felony murder it is not essential that the jury find that the predicate offense was actually completed. In effect, all the felony murder statute requires is for the jury to conclude that a criminal homicide was committed while the defendant participated in a completed or an attempted delineated, *i.e.,* predicate, offense.

 ¶ 18 The distinction becomes relevant for the *Magliocco* inquiry in that to the extent that felony murder does not require the commission, i.e., completion, of the predicate offense, an acquittal of the predicate offense will not always mean

that the homicide did not occur in the "perpetration of a felony." That is, the homicide could have occurred during the course of, or after, an unsuccessful attempt to commit the predicate offense. In that circumstance, a jury's conclusion that the predicate offense was not committed, *i.e.,* completed, should bar a conviction for that offense but would not bar a finding that a death occurred while the crime was being "perpetrated.[2]" Thus, it would be possible for a felony murder to occur even though the predicate offense was not "committed." Despite the above fact, we do not believe the distinction in language ends the inquiry, particularly when the predicate offense is robbery, as it was here.

¶ 19 The offense of robbery presents a unique question vis-à-vis the *Magliocco* holding because the offense of robbery is broadly worded and, similar to felony murder, also contains a predicate offense, that offense being theft. The statutory definition of robbery follows:

§ 3701. Robbery

(a) Offense defined.—

(1) A person is guilty of robbery if, in the course of committing a theft, he:

(i) inflicts serious bodily injury upon another;

(ii) threatens another with or intentionally puts him in fear of immediate serious bodily injury;

(iii) commits or threatens immediately to commit any felony of the first or second degree;

(iv) inflicts bodily injury upon another or threatens another with or intentional-

---

1. Black's Law Dictionary essentially equates the term "commit" with "perpetrate." Black's Law Dictionary 288 (8th Ed.2004). However, by adding the words "engaged in," the phrase takes on a broader meaning.

2. Of course, the fact that the offense was attempted but not completed could quite possibly expose the defendant to criminal liability for an attempt offense.

ly puts him in fear of immediate bodily injury; or

(v) physically takes or removes property from the person of another by force however slight.

(2) An act shall be deemed "in the course of committing a theft" if it occurs in an attempt to commit theft or in flight after the attempt or commission.

18 Pa.C.S. § 3701.

■ ¶ 20 Like felony murder, robbery does not require the completion of the predicate offense, theft, but it does require that force be utilized or threatened while in the course of committing a theft. Indeed, the term "perpetration of a felony" contained in the definition of felony murder is very similar to the phrase "in the course of committing a theft" contained in the definition of robbery. For all practical purposes, the phrase "in the course of committing a theft" is the equivalent of the "in the perpetration of" language found in the felony murder statute. The effect of this language is that an acquittal of robbery does not merely translate into the jury's finding that the offense had not been completed, i.e., that the contemplated theft was not committed. Rather, an acquittal of robbery translates into the jury's finding that either: (1) no force had been employed in the transaction that constituted a completed or attempted theft, including in flight after a completed or attempted theft, or (2) that if force was employed, it did not occur during a completed or attempted theft, or in the flight after either. Indeed, the broad wording of the offense of robbery negates, for the most part, the crime of attempted robbery as any overt attempt to commit theft will constitute robbery if the requisite force is employed. The court's instruction to the jury on this matter is instructive in this regard. The court stated:

In order to find the defendant guilty of robbery, you must be satisfied that the following two elements have been proven beyond a reasonable doubt:

First, that the defendant inflicted serious bodily harm upon Damon Williams;

And, second, that the defendant did so in the course of committing a theft.

Defendant's act is in the course of committing a theft not only if it occurs in the actual commission of theft but also in an attempt to commit theft. So there is no such crime of attempted robbery. If you're in the course of committing a theft, even if it is not brought to fruition, that does constitute a robbery.

N.T., 4/04/05, at 191–92.

¶ 21 When the above is considered, Appellant's acquittal of robbery translates to a determination by the jury that Damon Williams was not killed in the course of committing a theft, an attempt to commit theft or in flight after the attempt or commission of a theft. Since Damon Williams was killed, and since the jury returned a verdict of guilty of murder, the jury's verdict must be read to constitute a conclusion that Appellant did not steal or attempt to steal money from Williams and Griffith. Furthermore, due to the broad definition of robbery, this finding further negates the possibility that the homicide of Damon Williams occurred "in the perpetration of a robbery," the undisputed predicate offense for felony murder in this case. Thus, in the same fashion that Magliocco's acquittal of terroristic threats negated the possibility that terroristic threats had been committed "with malicious intention toward the race of another individual," Appellant's acquittal of robbery negates the possibility that Damon Williams was killed "in the perpetration of a robbery." Since the Commonwealth sought a separate conviction on the charge acting as the predicate for felony murder, and since the jury acquitted Appellant of

that predicate offense, *Magliocco* directs that this verdict of acquittal must be given special weight. To paraphrase the Supreme Court by substituting the relevant facts of this case, "since the factfinder in this case specifically found that Appellant did not commit the offense of robbery, the conviction for felony murder, which requires as an element the killing while in the perpetration of a robbery, simply cannot stand." *Magliocco*, 883 A.2d at 493.

¶ 22 In his second issue, Appellant, relying again upon the acquittal of the predicate robbery charge, asserts that the verdict was against the weight of the evidence. In light of our resolution of Appellant's first issue, this issue is now moot.

■ ¶ 23 Appellant next contends that the court erred in refusing to instruct the jury as to unreasonable belief voluntary manslaughter where there was sufficient evidence to support such a charge. We agree.

■ ¶ 24 A corollary to the defense of justification or self defense is unreasonable belief or "imperfect" self defense. As our Supreme Court has characterized this defense:

A self-defense claim under this theory is "imperfect in only one respect—an unreasonable rather than a reasonable belief that deadly force was required to save the actor's life. All other principles of justification under 18 Pa.C.S. § 505 must [still be met in order to establish] unreasonable belief voluntary manslaughter." *Commonwealth v. Tilley*, 528 Pa. 125, 595 A.2d 575, 582 (1991). In order to establish the defense of self-defense under 18 Pa.C.S. § 505, n9 the defendant must not only show that he was protecting himself against the use of

unlawful force, but must also show that he was free from fault in provoking or continuing the difficulty which resulted in the killing.

*Commonwealth v. Serge*, 837 A.2d 1255, 1265–66 (Pa.Super.2003).

¶ 25 The Commonwealth contends that the evidence did not support a charge for this defense because if Appellant's testimony had been believed by the jury it would have constituted self-defense and not imperfect self-defense. The Commonwealth's argument requires us to examine Appellant's testimony as to how the shooting occurred. Appellant testified that he shot Damon Williams when he observed Williams "going in his waistband, pulling out a gun." N.T., 4/04/05, at 89. Upon cross-examination, when pressed for more specific details about the incident, Appellant indicated that Williams started for his gun and began turning toward Appellant at the same time. Appellant then pulled out his own gun while making a combined grabbing/pushing motion at Williams,[3] and then fired a single shot into Williams' back. *Id.* at 103–04.

¶ 26 In asserting that Appellant was not entitled to a charge on voluntary manslaughter based upon unreasonable belief or imperfect self-defense, the Commonwealth states: "there were no facts presented that would have supported a verdict of voluntary manslaughter but not a finding of self-defense." Commonwealth's Brief at 11–12. With respect to this argument, Appellant counters that although he argued that the above facts would support a finding of justification/self-defense, the jury could have viewed the fact that he did not wait for Williams to actually brandish the weapon as supporting a conclusion that his belief that he needed to shoot Williams

**3.** Contrary to the testimony of Tyree Griffith, Appellant testified that Williams was situated in the driver's seat and that he was seated in the back seat, near the middle of the seat when the shooting occurred. N.T. 4/04/05, at 101.

was not justified or reasonable. We agree with this argument. In our opinion, the Commonwealth's characterization of this issue is a bit more clear cut than Appellant's testimony supports. Had Appellant testified that Williams had actually drawn and pointed the weapon at him before he fired at Williams, or had Appellant testified that Williams shot at him before he returned fire, then the Commonwealth's position would be accurate. There clearly would be no room for the jury to believe Appellant and not find self-defense/justification. However, given that Appellant did not wait for this to happen, a jury could possibly conclude that Williams had not yet fully demonstrated an intent to shoot Appellant, making Appellant's belief that he needed to shoot unreasonable. In a close call, we believe the benefit of the doubt must go to the defendant. A jury's verdict of guilty of voluntary manslaughter upon the above testimony would hardly be shocking. Thus, upon the evidence presented, we believe it was error not to issue the instruction when requested.

 ¶ 27 Appellant lastly contends that the evidence was insufficient to support the conviction for attempted murder of Tyree Griffith. We disagree. Although Appellant acknowledges that intent to kill can be inferred from the act of using a deadly weapon on a vital part of the body, Appellant posits that the evidence was insufficient to establish that he acted with intent to kill when he shot Tyree Griffith because he shot Griffith in the stomach. Appellant contends that the stomach is not a vital part of the body. Appellant's argument is simply preposterous and is contrary to established precedent. *See Commonwealth v. Sepulveda,* 579 Pa. 217, 855 A.2d 783, 788–89 (2004). One need not be

a medical doctor to understand that death can easily ensue from a gunshot wound to the abdomen. *Id.* As such, the premise of Appellant's argument is faulty and his argument fails accordingly.

¶ 28 For the above reasons, we conclude that Appellant's conviction for murder of the second degree and the life sentence imposed thereon must be reversed. Moreover, given the error in failing to instruct the jury on voluntary manslaughter, the case will be remanded for a new trial on a charge of third degree murder or a lesser degree of criminal homicide. However, as the error related only to the murder charge, there is no reason to upset the remaining convictions. Nevertheless, as the reversal of Appellant's life sentence has the potential to upset the court's sentencing scheme,[4] Appellant will be subject to resentencing, either at the conclusion of his new trial or upon the Commonwealth's indication that it will not seek re-trial, should the Commonwealth choose that course of action.

¶ 29 Judgment of life sentence reversed, judgment of sentence imposed on the remaining convictions vacated. Case remanded for a new trial on third degree murder and/or criminal homicide and/or for resentencing. Jurisdiction relinquished.

¶ 30 Judge Todd files a concurring opinion.

## CONCURRING OPINION BY TODD, J.:

¶ 1 While I agree with the Majority that the conviction for second-degree murder must be vacated, I come to that conclusion by a somewhat different route, and thus concur in the result on that issue. In all

---

4. "Because this disposition may disturb the sentencing scheme of the court below, [Appellant's] judgment of sentence is vacated in its entirety." *Commonwealth v. Smith,* 444 Pa.Super. 652, 664 A.2d 622, 630 n. 10 (1995) (citing *Commonwealth v. Goldhammer,* 512 Pa. 587, 517 A.2d 1280 (1986)).

other respects, I join the Majority opinion of my esteemed colleagues.

¶ 2 I conclude that the Majority's analysis, to the degree that it infers specific factual findings from the jury's acquittal of Appellant on the robbery charge, is not in accordance with Pennsylvania caselaw. Our Supreme Court has been emphatic that "an acquittal cannot be interpreted as a specific finding in relation to some of the evidence," because consistency in a jury's verdict in a criminal case is not required. *Commonwealth v. Campbell*, 539 Pa. 212, 219, 651 A.2d 1096, 1100 (1994) ("We interpret the acquittal as no more [than the jury's] assumption of a power which they had no right to exercise, but to which they were disposed through lenity." (internal quotation marks omitted)). That the Majority makes just such factual inferences in the process of analyzing the import of the jury's acquittal of Appellant on robbery, in my view, departs from this directive. *See* Majority opinion, at 1221. However logical these inferences may be, I conclude we are prohibited from making them. For example, while the Majority concludes that the acquittal on robbery necessarily implies that the jury found that Appellant did not steal or attempt to steal money from the victims, I note that the jury may have found that money was indeed stolen, but, through leniency or for whatever reason, nonetheless, and illogically, acquitted Appellant of robbery. Under *Campbell*, this it was free to do.

¶ 3 Under *Commonwealth v. Magliocco*, 584 Pa. 244, 883 A.2d 479 (2005), I conclude that the only evidentiary finding that may be drawn from an acquittal—and that this is the only exception to *Campbell*—is that the defendant did not commit a given offense. And where committing that offense is an element of another crime, the jury may not then convict the defendant of that other crime. To allow such a verdict would be to allow the jury to say, in essence, that the defendant both committed and did not commit an offense. While jury verdicts are otherwise allowed to be inconsistent, this gross degree of inconsistency is not allowed under *Magliocco*.

¶ 4 Thus, unless we can determine, based upon the statutory elements of the offenses, and without looking behind the jury's verdict of acquittal, that the jury's acquittal of Appellant for robbery *necessarily* negates the elements of felony-murder, then the verdict on felony-murder, even if inconsistent, must stand.

¶ 5 I regard such an inference as necessary in this case, however, for the following reasons. Herein, the jury was instructed that there was no such crime as attempted robbery, that robbery subsumed attempted robbery, or, more precisely, attempted theft. Majority Opinion, at 1221 (quoting jury instructions). Although this is not correct as a general proposition, *see, e.g., Commonwealth v. White*, 295 Pa.Super. 13, 18, 440 A.2d 1198, 1200–01 (1982) (approving jury instruction on crime of attempted robbery), nevertheless, the jury, as instructed, was not free to conclude that Appellant attempted a robbery; by its verdict, the jury necessarily acquitted Appellant of robbery *and* attempted robbery. Further, I find the definition of the relevant element of the felony-murder statute—"in the perpetuation of [robbery]"—to be so close to attempted robbery that I must conclude the jury's verdict reveals the gross inconsistency prohibited by *Magliocco*. By finding Appellant guilty of felony-murder, the jury necessarily found that Appellant completed or attempted a robbery; yet, by its acquittal of Appellant on robbery, it also found that Appellant did not complete or attempt a robbery. Because this level of gross inconsistency in the jury's verdict is not allowed under *Magliocco*, I agree with the Majority that

Appellant's conviction on felony-murder must be reversed.