2025 PA Super 42

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| AMIR KENNEDY | : | |
| | : | |
| Appellant | : | No. 298 WDA 2024 |

Appeal from the Judgment of Sentence Entered February 16, 2024
In the Court of Common Pleas of Westmoreland County
Criminal Division at No(s):  CP-65-CR-0002867-2022

BEFORE:  PANELLA, P.J.E., LANE, J., and BENDER, P.J.E.

OPINION BY PANELLA, P.J.E.:                **FILED: February 21, 2025**

Amir Kennedy appeals from the judgment of sentence entered in the Westmoreland County Court of Common Pleas on February 16, 2024. On appeal, Kennedy challenges the sufficiency of the evidence supporting his convictions. After careful review, we affirm.

The trial court comprehensively summarized the relevant evidence presented during trial, fully supported in the record, as follows:

> The instant case arises out of the shooting death of Jason Raiford on July 3, 2022 in New Kensington, Pennsylvania, Westmoreland County. Following an investigation, [Kennedy], along with co-defendants: Elijah Gary, Da'Montae Brooks, Raquan Carpenter, Braedon Dickinson, Avian Molter, and Jonathan Felder were charged in connection with this incident. Specifically, on July 3, 2022, a criminal information was filed charging [Kennedy] with the following offenses:
>
> 1. Criminal Homicide, in violation of 18 Pa.C.S.A. § 2501(a);

2. Murder of the First Degree, in violation of 18 Pa.C.S.A. § 2502(a);

3. Robbery−Inflict Serious Bodily Injury, in violation of 18 Pa.C.S.A. § 3701(a)(1)(i);

4. Robbery−Threat of Immediate Serious Injury, in violation of 18 Pa.C.S.A. § 3701(a)(1)(ii);

5. Aggravated Assault, in violation of 18 Pa.C.S.A. § 2102(a)(1);

6. Criminal Conspiracy to Commit Robbery, in violation of 18 Pa.C.S.A. § 903(a)(1);

7. Criminal Conspiracy to Commit Aggravated Assault, in violation of 18 Pa.C.S.A. § 903(a)(1);

8. Receiving Stolen Property, in violation of 18 Pa.C.S.A. § 3925(a); and

9. Possession of a Firearm by a Minor, in violation of 18 Pa.C.S.A. § 6110.1(a).

On December 4, 2023, [Kennedy] proceeded to a jury trial before [the trial] court along with co-defendants, Mr. Gary and Mr. Brooks. …

During trial, Jason Kerr, of the City of New Kensington Police Department, testified that on July 3, 2022, at 1:58 p,m., he received a dispatch to the Valley Royal Court Apartments in the city of New Kensington for shots-fired. Detective Paul Manke, of the New Kensington Police Department, and co-affiant on this case, testified that he also responded to the scene, and through his investigation, he obtained security video from the Stop N Go convenient store depicting [Kennedy] and his co-defendants prior to the incident as well as video surveillance footage from the Valley Royal Court Apartments depicting different angles during the time of the incident. The Commonwealth introduced these videos, as well as still images to establish a timeline of events and to depict the events that ultimately led to the death of Mr. Raiford and the events immediately following. The Commonwealth's theory at trial was that [Kennedy] along with his co-defendants participated in a plan to assault and rob Mr. Raiford over a drug

debt owed to Mr. Gary whereby they cornered the victim in front of a stairwell of an apartment complex; Mr. Gary attempted to pistol whip Mr. Raiford but dropped the gun resulting in a scuffle; and then [Kennedy], who was in possession of an AR-15 style semiautomatic rifle, exited the apartment complex and began shooting Mr. Raiford, killing him.

Forensic Pathologist, Doctor Jennifer Hammers, D.O. testified that she conducted an autopsy of Mr. Raiford on July 4, 2022. Dr. Hammers indicated that Mr. Raiford died as a result of gunshot wounds to his head, torso, and extremities. Specifically, Dr. Hammers identified 11 gunshot-wound paths that were distinct gunshot wounds. Dr. Hammers explained that the extensive injury to Mr. Raiford's brain would have most likely caused him to be immediately unconscious, and, therefore, unable to have any willful type of movement. Further, Dr. Hammers testified that given the level that his spinal cord was transected at, it would cause Mr. Raiford to be unable to utilize the lower part of his body, including his legs. Dr. Hammers testified that the gunshot wound to Mr. Raiford's head, as well as the two gunshot wounds that struck his heart, would almost certainly cause him to pass away. Additionally, Dr. Hammers confirmed that Mr. Raiford had four independent entrance wounds on his back.

Detective Toad Roach, of the Westmoreland County Detectives Bureau-forensic division, was qualified as an expert in forensic crime scene analysis at trial. Detective Roach testified that on the date of the incident, he responded to the Valley Royal Court Apartments and began processing the scene. Through his investigation, Detective Roach marked, measured, photographed, and secured items of evidentiary value. Specifically, Detective Roach testified that he recovered 12 spent cartridges, with two additional cartridge casing located later. Detective Roach testified that while processing the scene, he learned that a firearm was located underneath a bush by the nearby Geo-Solutions building, and he went to the location to photograph and secure the evidence. Detective Roach testified that the firearm, a Smith & Wesson M&P Model 15 Rifle, was in the fire position, and there was a round in the chamber.

Corporal Creighton Callas, an enlisted member of the Pennsylvania State Police and assigned as a firearm and tool mark examiner at the Greensburg Regional Laboratory, testified that he examined the firearm, discharged cartridge cases, and discharged

bullets that he received from Detective Roach. Corporal Callas stated that he examined the Smith & Wesson semi-automatic rifle that was submitted to him, and he confirmed that with a semiautomatic weapon, you have to pull the trigger and release it each time for the next subsequent discharge. Corporal Callas testified that through his examination, he was able to identify all of the discharged cartridge cases submitted to the submitted firearm. Additionally, Corporal Callas indicated that he examined both undischarged cartridges from the firearm that was submitted and bullet fragments and determined that the undischarged cartridges were consistent with the discharged cartridge cases, and the bullet fragments were consistent with the type that would have been from the firearm.

Mr. Carpenter, who was also charged with second degree murder and related offenses in connection with this matter, testified at trial. Mr. Carpenter's testimony established that on July 3rd, he was at the Valley Royal Court Apartments "couch surfing" before he went outside and was eventually met by Mr. Gary, Mr. Molter, [Kennedy], Mr. Brooks, Mr. Felder, and Mr. Dickinson. Mr. Carpenter stated that he sat with and talked to Mr. Gary on the steps in the foyer when he heard someone say, *Mr. Raiford is coming*. According to Mr. Carpenter, at this time, Mr. Gary informed him that he was angry because Mr. Raiford was "strong-arming him out of his money", and "he wasn't going to let him keep spinning him out of his money[,] he wasn't going to let him burn him again". Mr. Carpenter stated that guns were being passed around, and Mr. Gary asked Mr. Carpenter for the gun sitting next to him on the steps, and Mr. Carpenter handed it to him. Mr. Carpenter testified that he knew that there was going to be an altercation and since he had a personal relationship with Mr. Raiford, he got up and left the building as Mr. Raiford was entering.

Mr. Carpenter stated that after he exited, he observed from outside the door, Mr. Felder, Mr. Brooks, Mr. Dickinson, Mr. Molter, and [Kennedy] enter the building and someone said, "do you got the money?". Mr. Carpenter's testimony established that Mr. Raiford got aggressive, Mr. Gary punched him, they got into a scuffle, the same gun that Mr. Carpenter handed to Mr. Gary minutes earlier fell to the ground making a loud bang, and Mr. Raiford began yelling to get off of him and reached for and picked up the gun. According to Mr. Carpenter, Mr. Raiford stated, "Get the fuck-get back", while aiming the gun at everyone and moved

back in the direction of the door to exit. On cross-examination, Mr. Carpenter confirmed that Mr. Raiford said "like what the fuck is wrong with y'all, like, chill".

Mr. Carpenter testified that he began to run away but he stopped and observed Mr. Raiford angrily walking back towards the parking lot before he was shot by [Kennedy]. Mr. Carpenter confirmed that Mr. Raiford was not pointing the gun at [Kennedy], but Mr. Raiford made eye contact with him, and [Kennedy] fired *a lot* of rounds with most of the bullets hitting Mr. Raiford. Mr. Carpenter confirmed that Mr. Raiford went to the ground pretty quickly, and [Kennedy] continued to fire a couple of shots before moving the gun away from Mr. Raiford's body. At this time, Mr. Carpenter testified that everyone ran out of the building and scattered.

Detective Jason Napier, of the Westmoreland County Detectives Bureau and co-affiant on this case, testified relative to his involvement in this matter. Detective Napier stated that following the incident he, along with Detective Manke, reviewed the relevant video footage from the Valley Royal Coutt Apartments. When asked whether Detective Napier believed that the videos were consistent with a drug sale based upon his training and experience, he testified, "not at all". Rather, Detective Napier testified that the videos were consistent with a robbery. Detective Napier testified that on July 6, 2022, [Kennedy] was apprehended after turning himself in at the New Kensington Police Station, and on September 8, 2022, Mr. Gary and Mr. Brooks were apprehended by the U.S. Marshals. According to Detective Napier, he and Detective Manke interviewed Mr. Gary at the City of Lower Bunell Police Department. During the interview, Mr. Gary informed them that on the morning of July 3rd, he was present at Mr. Felder's residence in Arnold, along with [Kennedy], and the three of them went to 108 McCandless Street where they met up with Mr. Brooks, Mr. Molter, and Mr. Dickinson. According to Mr. Gary, [Kennedy] retrieved a rifle from inside the residence, and he stated that Mr. Brooks and Mr. Dickinson were also armed with firearms at that time. Mr. Gary relayed that the six of them left the residence on foot to "go down to the projects to chill", and on the way, they stopped at the Stop N Go.

During the interview, Mr. Gary stated that Mr. Raiford arrived at the location, and as he owed Mr. Gary a hundred dollars for crack cocaine, he was going to confront him. According to

Detective Napier, Mr. Gary told him that "*before they bring him back to me, meaning Jason Raiford, he said [Mr. CarpenterJ gave me his gun in case he tried to make a run for it*", and Mr. Gary acknowledged to striking Mr. Raiford with the gun before it fell to the floor. Detective Napier further stated Mr. Gary indicated that he remained inside while shots were being fired, and then he and Mr. Felder ran back to Mr. Gary's residence. During the interview, Mr. Gary allegedly stated that despite knowing detectives were looking for him, he panicked and stayed with his girlfriend, his godmother, and his sister before being picked up by the U.S. Marshals.

[Kennedy] also elected to testify during the trial. [Kennedy] testified that on the date of the incident, he went to the Stop N Go store with Mr. Gary and Mr. Felder before walking to the projects to "chill". [Kennedy] testified that at that time, he was in possession of a loaded rifle, which he previously purchased from someone on the streets of New Kensington and carried for his protection. [Kennedy] stated that he previously met Mr. Raiford a week or two before the incident when he was with Mr. Gary, and Mr. Gary told him that Mr. Raiford owed him money and he was going to confront him about it. During the interaction, [Kennedy] testified that Mr. Gary and Mr. Raiford got into an argument and Mr. Raiford threatened to kill both Mr. Gary and [Kennedy].

During trial, [Kennedy] testified as to the events that occurred on July 3rd leading up to Mr. Raiford's death. On cross-examination, [Kennedy] confirmed that when he left the residence where he was staying on the morning of the incident, he took his loaded long rifle with him and he concealed it down his pants. [Kennedy] confirmed that prior to Mr. Gary pistol whipping Mr. Raiford, the video displayed him pulling out his gun and taking a few steps forward. [Kennedy] claimed he did this because the argument started escalating, and he could tell that something was going to happen.

[Kennedy] stated that after the gun fell and Mr. Raiford was coming towards him, he tried to push Mr. Raiford with his rifle and then exited the building when he saw Mr. Raiford retrieve the gun off of the floor. [Kennedy] confirmed that the video exhibits depicted Mr. Raiford motion to Mr. Molter and Mr. Gary signifying "come on, we're done". According to [Kennedy], he exited the building because he was afraid, but he stopped to see if anyone else was coming out. [Kennedy] stated that he saw Mr. Raiford in

the doorway holding the gun, swinging it back and forth outside and inside of the building and yelling "watch out and move". [Kennedy] testified that in response, he continued to backup and raise the firearm he was holding.

[Kennedy] acknowledged to shooting Mr. Raiford, but he argued that he shot him in self-defense or defense of others because he was afraid that Mr. Raiford would point the gun back at him and possibly shoot him or Mr. Gary who was still inside the building. [Kennedy] testified that after shooting Mr. Raiford and retrieving the gun from him, he panicked and started running. [Kennedy] confirmed that he threw the rifle in a bush, and while he was running away, he stopped and changed his clothes.

Prior to jury deliberations, the Commonwealth orally moved to dismiss Count Seven[, criminal conspiracy to commit aggravated assault].

Trial Court Opinion, 4/17/24, at 1-8 (citations and unnecessary capitalization omitted; emphasis in original).

On December 8, 2024, the jury returned a verdict finding Kennedy guilty of all remaining counts. For the charge of criminal homicide, the jury specifically found Kennedy guilty of second-degree murder. Sentencing was deferred pending a pre-sentence investigation.

On February 16, 2024, the trial court sentenced Kennedy to an aggregate term of 30 to 60 years' incarceration followed by one year of reentry supervision, plus restitution, costs, and fees. No post-sentence motions were filed. This timely appeal followed.

Kennedy raises the following issues on appeal:

1. Whether the [trial court] erred in determining the Commonwealth disproved [Kennedy]'s claims of self-defense and defense of others beyond a reasonable doubt when [Kennedy] attempted to flee the alleged "robbery" attempt before being

- 7 -

confronted by the decedent armed with a pistol aimed at his co-actors and before the decedent advanced toward [Kennedy]?

2. Whether the [trial court] erred in determining the Commonwealth produced sufficient evidence to convict [Kennedy] of robbery, conspiracy to commit robbery, and murder of the second degree beyond a reasonable doubt when the Commonwealth failed to elicit evidence that [Kennedy] entered into an agreement to commit robbery or otherwise participated in a robbery when [Kennedy]'s co-defendant, Elijah Gary, merely confronted the decedent regarding a drug debt which resulted in an altercation between multiple individuals from which [Kennedy] fled before being confronted by the armed decedent?

Appellant's Brief, at 2-3.

As both of his issues challenge the sufficiency of the evidence, we begin by noting our standard of review:

The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the finder of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

**Commonwealth v. Gause**, 164 A.3d 532, 540-41 (Pa. Super. 2017) (*en banc*) (citation omitted).

Kennedy's first argument is based on his belief that he acted in justifiable self-defense or in defense of others. Therefore, according to Kennedy, the evidence was insufficient to sustain his convictions for first-degree murder and aggravated assault.

As our Supreme Court has explained:

> To prevail on a justification defense, there must be evidence that the defendant (a) ... reasonably believed that he was in imminent danger of death or serious bodily injury and that it was necessary to use deadly force against the victim to prevent such harm; (b) that the defendant was free from fault in provoking the difficulty which culminated in the slaying; and (c) that the [defendant] did not violate any duty to retreat.

*Commonwealth v. Sepulveda*, 55 A.3d 1108, 1124 (Pa. 2012) (citations and internal quotation marks omitted). "A defendant's subjective state of mind does not establish the objective factor of the reasonableness of his belief." *Id.* at 1125 (citation omitted). Further, it is for the trier of fact to determine whether an individual's belief was reasonable, whether he was free of provocation, and whether he had no duty to retreat. *See Commonwealth v. McClendon*, 874 A.2d 1223, 1229-30 (Pa. Super. 2005).

When an individual claims self-defense or defense of others, both of which are subsumed under the justification defense, the Commonwealth has the burden to prove beyond a reasonable doubt that the killing was not committed in self-defense or in defense of others.

> In order to disprove self-defense [or defense of others], the Commonwealth must prove beyond a reasonable doubt one of the following elements: (1) that the defendant did not reasonably believe it was necessary to kill in order to protect himself [or

others] against death or serious bodily harm, or that the defendant used more force than was necessary to save himself [or others] from death, great bodily harm, or the commission of a felony; (2) that the defendant provoked the use of force; or (3) that the defendant had a duty to retreat and that retreat was possible with complete safety. **See** 18 Pa.C.S.A. § 505(b)(2). If the Commonwealth establishes any one of these three elements beyond a reasonable doubt, then the conviction is insulated from a defense challenge to the sufficiency of the evidence where self-protection [or protection of others] is at issue.

**Burns**, 765 A.2d at 1149 (some citations omitted).

Kennedy presents a series of assertions, which he frames as undisputed, in his attempt to demonstrate the validity of his justification defense:

The evidence suggests it was Raiford, not Kennedy, that became aggressive when confronted about a drug debt. It was Raiford who armed himself, fervently waiving a firearm in the direction of Kennedy and others. Although Kennedy attempted to retreat, he feared he would be shot by Raiford if his back remained to the agitated and unpredictable Raiford. [] Kennedy was therefore justified in shooting [] Raiford to death for fear for his own safety and that of others, which the Commonwealth has not sufficiently disproven.

Appellant's Brief, at 26-17.

The trial court addressed and rejected Kennedy's justification argument in its Rule 1925(a) opinion as follows:

The evidence presented by the Commonwealth at trial established that [Kennedy] used deadly force on Mr. Raiford. Although testimony and video exhibits established that Mr. Raiford was also in possession of a firearm after retrieving it from the ground, there was no evidence presented that Mr. Raiford directly pointed the gun at [Kennedy] while he was outside of the building or that his words or conduct showed an intent to shoot [Kennedy] or the co-defendants. Rather the evidence appears to establish that Mr. Raiford, although reactive, attempted to deescalate the situation, and leave the premises further unscathed and without further incident. The video exhibits depict Mr. Raiford waving the

- 10 -

gun around and attempting to leave through the front door of the building heading in the direction of his car in the parking lot.

Mr. Carpenter confirmed that although Mr. Raiford seemed angry, he was not pointing the gun at [Kennedy] when he exited the building. Similarly, [Kennedy]'s own testimony established that although fearful that Mr. Raiford may *wave* the gun at him, Mr. Raiford was not pointing the firearm at him at the time he shot him. Not only does the Commonwealth's evidence demonstrate that [Kennedy] could have safely retreated by continuing to run away to escape danger, there is overwhelming evidence that [Kennedy] was not free from fault in provoking or escalating the altercation that led to the offense. The video evidence presented at trial established that [Kennedy], along with his co-defendants went to the Valley Royal Court Apartments on the date of the incident armed with firearms. [Kennedy] confirmed that he was in possession of a loaded long rifle, in which he concealed down his pants. Mr. Carpenter also confirmed that guns were being passed around.

Although [Kennedy] denies any plan to rob or assault Mr. Raiford, Detective Napier's testimony established that the video exhibits were consistent with a robbery, and Mr. Carpenter's testimony established that he knew there was going to be an altercation with Mr. Raiford. Video exhibits established that once Mr. Raiford entered the building led by Mr. Felder, [Kennedy], Mr. Brooks, Mr. Dickson, and Mr. Molter also entered the building. Mr. Carpenter's testimony established that someone asked Mr. Raiford if he had the money, and the video exhibits depict Mr. Felder, Mr. Brooks, Mr. Dickinson, Mr. Molter, and [Kennedy] boxing Mr. Raiford in at the stairwell. [Kennedy] confirmed that during the interaction between Mr. Gary and Mr. Raiford, before the gun was dropped, the video displayed [Kennedy] pull out his gun and take a few steps forward. [Kennedy] also stated that after the gun fell and Mr. Raiford was coming towards him, he tried to push Mr. Raiford with his rifle. Mr. Carpenter's testimony established that Mr. Raiford said, "like what the fuck is wrong with y'all, like, chill", and [Kennedy] confirmed that the video exhibits depicted Mr. Raiford motion to Mr. Molter and Mr. Gary signifying "come on, we're done".

The Court finds that even if [Kennedy] was in fear for his life or his co-defendant's lives, he used more force than was reasonably necessary to protect against death or serious bodily

- 11 -

injury. Video evidence established that after turning around outside, [Kennedy] raised the gun, aimed it at Mr. Raiford, and repetitively pulled the trigger fourteen times, while advancing in on him. Mr. Raiford's body was struck by at least eleven bullets, four of which directly entered Mr. Raiford's back.

Mr. Carpenter's testimony revealed that [Kennedy] fired a lot of rounds, and Mr. Raiford went to the ground pretty quickly. The video evidence depicts [Kennedy] continuing to shoot Mr. Raiford multiple times while he laid nearly motionless on the ground. Dr. Hammers' testimony established that Mr. Raiford died as a result of the gunshot wounds to his head, torso, and extremities, with the gunshot wounds to Mr. Raiford's head and heart almost certain to be fatal. After shooting Mr. Raiford and retrieving the gun next to him, [Kennedy] fled the scene, disposed of the long rifle in a bush, and stopped and changed his clothing. The gun that was in possession of Mr. Raiford and moved by [Kennedy] and allegedly left in [Kennedy]'s discarded backpack was never recovered. Although [Kennedy] asserts that he shot Mr. Raiford in defense of his co-defendants, specifically, Mr. Gary, video exhibits and testimony establish that Mr. Raiford was already in the doorway of the building and was attempting to walk in the direction away from the building and away from Mr. Gary at the time [Kennedy] shot and killed him.

Trial Court Opinion, 4/17/24, at 11-14. We agree with the trial court's thorough reasoning.

Our review confirms the Commonwealth presented sufficient evidence, and the jury found beyond a reasonable doubt, to disprove Kennedy's justification defense. Raiford did not initiate the altercation. Rather, Kennedy and his co-defendants, after arming themselves with multiple firearms, cornered Raiford and demanded money owed to Gary.

Although Kennedy testified that he feared for his life, the fact-finder had no obligation to credit that testimony. *See Commonwealth v. Jones*, 271 A.3d 452, 458 (Pa. Super. 2021). Kennedy focuses on Raiford's possession of

a gun to support why he was in fear and could not retreat. However, by Kennedy's own admission, and the testimony of others, Raiford was only in possession of the gun because Gary dropped his gun after attempting to hit Raiford with it, and Raiford was only waving the gun around. There is no testimony from Kennedy or anyone else that Raiford ever pointed the gun at anyone or otherwise attempted to use the gun.

Even assuming, arguendo, that Kennedy was in fear, Kennedy fails to explain how there was insufficient evidence based upon his justification defense when the Commonwealth presented evidence that he shot Raiford a total of eleven times, four of which were in the back. *See Commonwealth v. Smith*, 97 A.3d 782, 787 (Pa. Super. 2014) (holding the Commonwealth can negate a justification claim by establishing a defendant "used more force than reasonably necessary to protect against death or serious bodily injury.") (citation omitted). Because the Commonwealth disproved Kennedy's justification defenses beyond a reasonable doubt, Kennedy's first sufficiency challenge merits no relief.

In his second and final issue, Kennedy argues the evidence was insufficient to support his convictions for robbery, conspiracy to commit robbery and second-degree murder. Specifically, Kennedy argues the Commonwealth failed to produce sufficient evidence that he engaged in a robbery or conspired to do so.

- 13 -

Kennedy contends the Commonwealth did not prove that an agreement existed to rob Raiford. Kennedy asserts there was no evidence that he was aware Gary intended to confront Raiford. According to Kennedy, he was merely present when a confrontation occurred between two other individuals–Gary and Raiford–regarding an outstanding debt between those individuals. *See* Appellant's Brief, at 30.

The statutory definition of second-degree murder, commonly known as felony-murder in Pennsylvania, provides:

**§ 2502. Murder**

…

**(b) Murder of the second degree.**—A criminal homicide constitutes murder of the second degree when it is committed while defendant was engaged as a principal or an accomplice in the perpetration of a felony.

…

"**Perpetration of a felony.**" The act of the defendant in engaging in or being an accomplice in the commission of, or an attempt to commit, or flight after committing, or attempting to commit robbery, rape, or deviate sexual intercourse by force or threat of force, arson, burglary or kidnapping.

18 Pa.C.S.A. § 2502(b), (d).

The robbery of Raiford was the predicate offense for the charge of felony murder. Kennedy was convicted of robbery under 18 Pa.C.S.A. § 3701(a)(1)(i) and (ii), which provide:

**§ 3701. Robbery**

**(a) Offense defined.**—

- 14 -

> (1) A person is guilty of robbery if, in the course of committing a theft, he:
>
> (i) inflicts serious bodily injury upon another;
>
> (ii) threatens another with or intentionally puts him in fear of immediate serious bodily injury;

18 Pa.C.S.A. § 3701(a)(1)(i)-(ii) (bold in original). The offense of robbery, similar to felony murder, also contains a predicate offense—theft.

> Like felony murder, robbery does not require the completion of the predicate offense, theft, but it does require that force be utilized or threatened while in the course of committing a theft. Indeed, the term "perpetration of a felony" contained in the definition of felony murder is very similar to the phrase "in the course of committing a theft" contained in the definition of robbery. For all practical purposes, the phrase "in the course of committing a theft" is the equivalent of the "in the perpetration of" language found in the felony murder statute.

*Commonwealth v. Austin*, 906 A.2d 1213, 1221 (Pa. Super. 2006).

Finally, "[a] person is guilty of conspiracy with another person or persons to commit a crime if with the intent of promoting or facilitating its commission he ... agrees with such other person or persons that they or one or more of them will engage in conduct which constitutes such crime ...." 18 Pa.C.S.A. § 903(a).

A "conspiratorial agreement can be inferred from a variety of circumstances including, but not limited to, the relation between the parties, knowledge of and participation in the crime, and the circumstances and conduct of the parties surrounding the criminal episode." *Commonwealth v. Feliciano,* 67 A.3d 19, 26 (Pa. Super. 2013) (*en banc*) (citation and internal

- 15 -

quotation marks omitted). "The conduct of the parties and the circumstances surrounding such conduct may create a web of evidence linking the accused to the alleged conspiracy beyond a reasonable doubt." *Id.* (citation omitted).

The facts, viewed in a light most favorable to the Commonwealth, establish beyond a reasonable doubt that Kennedy is guilty of second-degree murder, robbery, and conspiracy to commit robbery. Kennedy's claim that he was merely present at the scene ignores our standard of review and disregards a signification portion of the evidence in the certified record.

Instead, the evidence shows that after learning Raiford was at the apartment complex, Gary informed his co-defendant's of his anger over an outstanding debt owed to him by Raiford; with this knowledge in mind, Kennedy, along with other co-defendants, equipped themselves with firearms to head over to confront Raiford. After confronting Raiford, including a demand for the money, an altercation ensued eventually leading to Kennedy fatally shooting Raiford eleven times. Based upon the testimony presented, the jury could reasonably infer there was a conspiratorial design to commit the underlying felony—the robbery of Raiford—of which Kennedy was a part.

As we find the evidence was sufficient to support Kennedy's convictions, we affirm the judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary


DATE: 02/21/2025